### F. L. LINCH v. PARIS LUMBER AND GRAIN ELEVATOR COMPANY.

#### No. 6414.

1. **Specifications in Building Contract.** — In a building contract the specifications gave the dimensions of iron columns to be used in the front, using the following expression, "The above numbers refer to Pullis Bros'. Catalogue." It was shown that the contractor had the work cast of the dimensions and pattern "No. 47" of that catalogue. *Held,* it was competent and relevant to prove that the columns furnished were substantially like Pullis' No. 47, and that the pillars so furnished were of dimensions indicated by the base as shown in the specifications, although not made at the factory of Pullis Bros.

2. **Same — Construction.** — We think it clear by the use of the expression, "The above numbers refer to Pullis Bros'. Catalogue," the parties did not contract for the use of columns made by Pullis Bros. to the exclusion of those made by any other manufacturer.

3. **Evidence — Practice in District Court.** — It was competent to allow a piece of a broken cast iron column to be exhibited in evidence to the jury. It was within the discretion of the court to permit it to be taken with them into the jury room, the testimony being relevant to the issue.

4. **Substantial Compliance with Specifications.** — It was objected to the charge that it authorized a recovery by the plaintiff upon its showing a substantial compliance with the terms of its contract, for breach of which by the defendant the suit was brought. Objection was based upon the proposition that a literal performance was required in each and every particular. *Held,* such precision can not we think be demanded in the performance of contracts or any other affair of life.

5. **Same.** — If there is an honest effort to perform the contract according to the letter and it is substantially fulfilled the builder should be entitled to the reward of his labor, although he may not have in every instance complied with its terms literally in every punctilio. A substantial compliance without any intentional variation in all cases should be considered as a full performance of a condition whether precedent or subsequent. Smith v. Gugarty, 4 Barb., 620.

6. **Charge.** — A building contract the basis of litigation was lengthy, confused, and apparently contradictory. There was testimony to items about which it was disputed whether they were provided for in the writing. No explanatory charge was asked upon the controverted parts of the specifications. *Held,* a charge was proper submitting to the jury: "Where there is a conflict if any in these (specifications) this should be reconciled in a practical workmanlike manner, so as to arrive at the fair and reasonable intention of the same."

7. **Architect's Certificate as Basis for Payment.** — In the building contract provision was made for a superintendent, upon whose certificates payments were to be made. When without fault of the contractor the architect or superintendent refuses

[23]

his certificate, he can not thereby prevent a recovery by the contractor for damages suffered by him from the breach of the contract by the employer.

8. **Forfeiture Stipulated in Building Contract.**—It was stipulated that "upon failure by the contractor to comply with the requirements of the contract the owner after giving ten days notice of his intention to do so, to be served upon the contractor, either could complete the contract himself or avoid it; in which latter case all work done or material on the ground should become the property of the employer;" and further: "Any material condemned must be immediately removed from the building and grounds and any work that may be condemned must immediately be made good." It is *held*, the contract thereby meant that whenever a cause for forfeiture should occur it should then promptly be declared and proceeded with, or in the language of the contract the faulty material should have been then "immediately removed from the building" and the condemned work "immediately made good," or the failure to do so considered as an acquiescence and waiver, at least of the right to forfeit for that part of the undertaking.

APPEAL from Lamar.  Tried below before Hon. H. O. Head, Judge of the Fifteenth Judicial District, exchanging with Hon. D. H. Scott. The opinion states the case.

*Hale & Hale, H. D. McDonald,* and *J. H. Warren,* for appellant.—1. When a specific article easily obtainable is called for in a contract, a different article of a different appearance, of less weight and value, though substantially like the one called for in the contract, will not fulfill the contract unless by consent of both parties to it.  In his charge the court instructed the jury among other things that it was the duty of the plaintiff to construct the building in substantial compliance with the contract, plans, and specifications; and all the way through the charge made what the jury might conceive to be a substantial compliance with the contract all that was necessary for plaintiffs to do to entitle it to recover.  Menard v. Sydnor, 29 Texas, 257; Watrous v. McKie, 54 Texas, 71; Bish. on Con., sec. 381, and authorities there cited; 2 Pars. on Con., 500–506; Crane v. Knubel, 61 N. Y., 645; Spalding v. Rosa, 71 N. Y., 42; Hill v. Blake, 97 N. Y., 220–222.

2. It is improper to permit the jury to carry with them into the jury room during their deliberations objects, tools, etc., which had been offered in evidence, and especially where such objects or articles are not described and no legitimate reason shown for their introduction, and especially where no legitimate object can be accomplished by their introduction in evidence, and their introduction into the jury room over the objection of appellant's counsel was calculated to prejudice and mislead the jury to the injury of appellant.  Rev. Stats., art. 1303; Smith v. State, 42 Texas, 444.

3. Parties to a contract are bound by the terms which they have voluntarily employed, and a stipulation for a particular thing will not be satisfied by something else, presumedly as good, or something substantially in compliance with the contract, in a case where the thing con-

tracted for is easily obtainable. Menard v. Sydnor, 29 Texas, 257; Watrous v. McKie, 54 Texas, 71; Bish. on Con., secs. 381, 382, and authorities there cited; 2 Pars. on Con., 7 ed., 491, 500, 506; Keeley v. Railway, 67 Me., 163; Howard v. Railway, 61 Miss., 194; Clark v. Pope, 70 Ill., 128; Crane v. Knubel, 62 N. Y., 645.

4. It is the duty of the court (not the jury) to construe written contracts, and the jury are not in any case authorized to reconcile conflicts in a "practical workmanlike" manner, and the jury were likely misled by the charge of the court. 1 Greenl. on Ev., sec. 277; 73 Pa. St., 46; 87 Pa. St., 256.

5. In this case it was necessary for the plaintiff to produce the certificate of McGinnis, the architect, to the effect that the work done and materials furnished by plaintiff were in accordance with the contract and satisfactory to the architect, or show that it was unjustly, improperly, or fraudulently withheld. Railway v. Henry & Dilley, 65 Texas, 685; 2 Suth. on Dam., 521; Wheeler v. Boyd, 114 Pa. St., 228; Smith v. Bridges, 3 Denio, 73.

*Maxey, Lightfoot & Denton,* and *J. G. Dudley,* for appellee.—1. The contract did not call for columns to be made by Pullis Bros., and the evidence of A. J. Deal complained of was both material and relevant.

One of the issues made by appellant was that intermediate iron columns did not come up to the contract.

A. J. Deal testified that "the iron sills and iron work were the best ever brought to Paris. They were put up in a first class manner. The work was done in accordance with the plans and specifications as near as possible. * * * The columns we bought and the work we did were just as strong and just as good as the columns and work that defendant afterward used in the building and as near Pullis' No. 47 as could be made."

The only notice in the specifications of the columns referred to is as follows: "Iron work: * * * Intermediate columns No. 47, 8″ 15′ 6″. Interior columns, similar to No. 16. * * * The above numbers refer to Pullis Bros'. Catalogue."

W. G. Barry testified: "No figures given in Pullis Bros'. catalogue to show size of column, except it shows an 8 inch in diameter; no width of base is given, none in plans and specifications. Plaintiff's columns conform as nearly as possible to Pullis Bros'. No. 47; very little variations. The columns that plaintiffs put in are not made by Pullis Bros.; were as near to their No. 47 as shown in their catalogue as they could be made."

Mr. Patchell testified: "That he is superintendent and architect of the iron department of Sharppe & Cokan, who furnished the iron work for plaintiffs, that he had the plans and specifications for the Linch building before him when the iron work was made, and that it con-

formed to such plans and specifications 'as nearly as it was possible for human skill to make it.' * * * Every house of any importance has its own catalogue, but they all use each other's cuts. * * * All the iron work conformed in every respect to the plans and specifications introduced in evidence and was in every respect a first class job." 1 Wait's Acts. and Defs. p. 119, sec. 7; Id., sec. 8; Id., sec. 12; 1 Add. on Con., sec. 318.

2. Where the contract between the two parties made the plans and specifications a part of such contract and the specifications failed to show the dimensions of the base of the column, it was proper to ascertain the dimensions of such base by the plans, and the testimony of W. H. Wilson was competent. Continental Ins. Co. v. Pruitt, 65 Texas, 129.

3. All that is required in any case is a substantial compliance with the contract, and in this case it having been fully shown that appellee did comply with the contract in every particular, as fully as it could be done in any case, the charge of the court was correct. Wooters v. Railway, 54 Texas, 300.

4. While it is the duty of the court to construe written contracts, it is the province of the jury to ascertain from the facts proved whether there has been a substantial compliance in every material particular in each item as called for by a fair, reasonable, and practical construction of the contract, plans, and specifications taken together, and the charge of the court upon this subject was correct.

It having been shown that the contract was being fully carried out by plaintiff until defendant wrongfully took possession without the consent of plaintiff, and this being a suit for damages by plaintiff for the wrongful act of defendant in violating the contract, no certificate from McGinnis was necessary, and the charge of the court was proper. Railway v. Henry & Dilley, 65 Texas, 685; 2 Suth. on Dam., 521.

The case was reversed and remanded at Tyler. Opinion by Presiding Judge Acker. A motion for rehearing was carried to Galveston, and on motion for rehearing the judgment below was affirmed. The opinion on rehearing alone is given.

HENRY, ASSOCIATE JUSTICE.—This suit was brought by the appellee to recover damages for a breach of contract.

The parties signed a written contract in which appellant was styled "employer" and the appellee was styled "contractor." We copy the following extracts from the contract:

"1. The contractor agrees to furnish all the material and do all the work of whatever kind required by or reasonably to be inferred from the plans and specifications prepared by W. A. McGinnis, said plans and specifications being hereby incorporated with and made part of this

contract, for the full and entire completion of a three-story brick business block in the city of Paris, Texas, for the sum of $16,450.

"2. The contractor agrees that all materials called for in the plans and specifications are to be of the first qualities of their respective kinds, and that all of the work shall be done in the most thorough and workmanlike manner, and that he will not vary in any manner from the said plans and specifications without the written consent of the employer.

"4. The employer reserves the right to order in writing any alteration he may deem proper from the said plans and specifications.

"8. The employer reserves the right to appoint a superintendent or inspector of this improvement, and it is expressly stipulated and agreed that no claim shall be made or suit brought for any sum due or claimed to be due for said improvement unless upon certificate of said superintendent or inspector that the improvement has been made in strict accordance with the contract and plans and specifications, or such alterations as may have been made therein in accordance with the stipulations of this contract.

"9. Upon the failure of the contractor to proceed with said improvement to the satisfaction of the employer so as to secure the completion of the improvement within the stipulated time, or upon his failure to comply with the requirements of this contract, it shall be lawful for the employer, after giving ten days' notice of his intention so to do, to be served upon the contractor, either to complete said improvement by contract or by day's work at the expense of the contractor, and recover from him and his sureties the additional expense thereby incurred, if any, over the amount due according to this contract; or at the option of the employer to entirely avoid the contract and bring suit at once against the contractor and his sureties for the damage occasioned thereby, in which latter case all work done and materials on the ground are to become the property of the employer without any further payment therefor. The payments are to be made, upon the production of the certificate of the superintendent, in the following manner:

"(1) $1500 to be paid after the foundation is laid.

"(2) $3000 to be paid after the first story walls are up and second set of joists are in and bridged.

"(3) $2250 to be paid after the second story is up and the third set of joists are in position and bridged.

"(4) $2750 to be paid after the ceiling and roof joints and bridged roof and cornice are on.

"(5) $2500 after floors are laid, ceilings up, and all sash in and hung.

"(6) $3000 to be paid after the plastering is finished and the front put in.

"(7) The last payment of $1450 to be made when the building is finished and approved by the owner and superintendent."

The original plans are made part of the record, and it also contains the specifications, covering eighteen closely written pages.

The specifications minutely cover every detail of the improvement from the bottom of the foundation to the top of the roof, and the plans exhibit it in the same way.

Among others the specifications contain the following provisions:

"Said building to be erected in strict accordance with these specifications and accompanying drawings prepared by W. A. McGinnis, architect.

"The several floor plans and elevations are drawn to a uniform scale of four feet to one inch, but in all cases the figures marked on the several drawings are to be taken in preference to measurements by such scale, and should any error be discovered the same must be referred to the architect for adjustment and correction.

"The contractors for the work shall have a competent foreman on the work at all times to whom the architect can give instructions in the absence of the contractor.

"All work to be done in a thorough, workmanlike manner, to the full satisfaction of the architect and owner, and any material condemned must be immediately removed from the building and grounds, and any work that may be condemned must immediately be made good.

"Iron work: The angle or box columns on front to be 16″ face, 16″ back or sides 16″; No. 4, 3-16″x16″x15′ 16″. Intermediate columns No. 47, 8″ 15′ 6″. Interior columns similar to No. 16. Girders to be 17″ double ribbed. Door and window sills to have a face to match stone work. The above numbers refer to Pullis Bros'. Catalogue. Sills of doors to be 18½″. All window sills to be 8″ wide and extend into the wall at least 4″ at each end. Window sills on south and west fronts to have a box 2½″ back and to extend out flush with stone belt. Sills in the east end to be plain but boxed. Owner's name to be placed or cast on all door sills. All columns to be full ¾ thick."

Plaintiff's original petition charged that while it was proceeding in good faith to construct the improvement according to the contract, and when it had so completed the first story of the building and had placed the joists thereon and become entitled to have paid to it the second installment of its compensation, the defendant willfully and wrongfully refused to carry out the contract, unlawfully took possession of the building, and ejected therefrom plaintiff's workmen, etc.; and it gave a specific statement of the damages that had resulted to it from defendant's breach of the contract.

We copy a statement of the subsequent pleadings of the parties from appellant's brief which, in so far as it becomes necessary to consider them on this appeal, are as follows:

"The defendant alleged that by the terms of the contract all materials were to be of the best quality, the work to be done in the most thorough

and workmanlike manner, and that plaintiff would not vary in any manner from the plans and spcifications without the written consent of defendant, but alleges that plaintiff without consent varied from the contract as to both materials and workmanship, used inferior materials, of less service, less cost, and less value than the contract called for, to-wit:   The bricks, mortar, all iron and iron work, front, iron columns, sills, window sills, interior columns and all iron work, the joists, sleepers, and other lumber, were inferior and not in compliance with the contract, and of less value, and at less cost than the contract calls for.   Iron front not so fine nor as well ornamented and much lighter than that called for in the contract.   Door sills were not bush hammered to match stone work.   Front door sills had no flat face, but were of the old regulation style.   Window sills at the east end of the building were too short.   Sill course on south side too high for west front.   Floor out of level, did not match at southwest corner as to height, and not alike.   Door frames of first story set back too far from face of wall and too narrow.   Foundation and second set of joists out of level.   Northeast corner of first story lower than southwest corner.   No trimmings or headers doubled at well holes of stairs or around flues.   Joists not trebled under main hall walls nor under other partitions.   Girders and joists of second story not level, columns not set level, plates under ends of girders were $\frac{1}{4}$x7x18, and $\frac{1}{4}$x7x27 instead of $\frac{1}{2}$x6x36 inches.   South and east wall not laid up with neatly struck joints, rear doors and windows not on a line at top.   Sash pulleys iron instead of 'steel axle.'   Intermediate columns were not of the dimensions as No. 47, Pullis' Catalogue.   No name cast in or on part of the door sills.   Too many soft bricks used.   All of which is variant from the contract and impaired the value of the building; that by the terms of the contract defendant had a right to appoint a superintendent or inspector of the work, and that no claim should be made or suit brought for any sum due or claimed for work unless upon certificate of said superintendent that the work was in strict accordance with the contract and plans and specifications, * * * and that upon a failure of the contractor to proceed with the work to the satisfaction of the employer so as to secure its completion within the stipulated time, or upon a failure to comply with the contract, it was lawful for the employer, after ten days' notice, either first to complete said improvements by contract or by day's work at the expense of the contractor and recover from him the additional expense; * * * or second, at the option of the employer, to entirely avoid the contract and sue the contractor and his sureties for damages; in the latter case all work done and materials on the ground were to belong to the employer, etc.   Defendant alleges a failure on the part of plaintiff to proceed to the satisfaction of the employer or in accordance with the contract, after which, and on the 16th day of December, 1886, he notified plaintiff in writing of the defects in the work and materials and declined to pay therefor.

Again, on the 24th day of December defendant gave plaintiff the same notice, and that he would not receive the work and materials, and called upon plaintiff to comply with its contract or abandon the job and let defendant take charge of it under the contract, etc. Again, on the 27th of December, 1886, defendant by letter urged plaintiff to comply with its contract or he would have the building completed by other means. Plaintiff then declined to go on with the work unless defendant would receive and pay for what had already been done, paying therefor $3000, less 15 per cent, which defendant declined, because the work and material did not comply with the contract, and because plaintiff did not produce the certificate from W. A. McGinnis, the architect, that the work and materials were satisfactory.

"Defendant alleged that plaintiff voluntarily abandoned the job, after which, and on the — day of January, 1887, he took charge of the work and had it completed as soon as possible and at the least possible cost in accordance with the original plans and specifications, first tearing down the east and south walls; that he got it completed in September, 1887; that defendant paid plaintiff the first installment under the contract, to-wit, $1275, which was pay for the foundation, which defendant agreed to accept, and which was an adjustment of all matters up to the first joists, but as soon as plaintiff commenced work above that both he and the superintendent objected to the work that was being done and the materials used, and continued to object up to the time plaintiff quit the job, telling plaintiff the work and materials would not be received or paid for as it was being done, and that plaintiff would thus proceed at its peril, pointing out the defects."

Defendant alleged that he had completed said building as cheaply as possible and that it cost him $21,861.80, less $1418.08 paid for extra work and materials to complete the improvement.

Plaintiff in reply further filed: First, general denial, and specially denied that plaintiff's work and material were inferior or that plaintiff failed to comply with its contract. Alleged that if the building was not level it was caused by W. A. McGinnis, defendant's architect, who pretended to level it; that McGinnis knowingly and fraudulently attempted to get the building out of level for the purpose of causing the plaintiff to do a large amount of extra work, but that plaintiff did make it level and in a workmanlike manner; that McGinnis tried to prevent plaintiff getting the contract and tried to get it for another party, and that McGinnis acted fraudulently and oppressively for the purpose of breaking plaintiff down and driving it from the contract, and after the contract was signed changed the specifications by inserting iron instead of wooden girders, but plaintiff had it corrected; compelled plaintiff to tear up the west wall of the foundation before he would make the required certificate, and required it laid in Portland cement instead of Rosendale cement, which latter is the kind called

for in the specifications; threatened that plaintiff would never get its second estimate; was present when plaintiff put the iron work in said building, he made no objection to the same; made no objections to the walls of the first story until they were up and second joists placed, but tried to hire plaintiff's foreman to do some extra bridging on second floor joists; that McGinnis knowingly and fraudulently refused plaintiff the estimate or certificate for the second payment for the purpose of breaking plaintiff down and driving it from the contract in order to get to build the house himself and in order to make Linch buy materials from persons from whom McGinnis received a commission on sales; that McGinnis insisted on plaintiff doing more than the contract required, and refused to give the estimate unless plaintiff would comply with the demand; that defendant, with full knowledge of the fraudulent acts of McGinnis, kept him as superintendent, although plaintiff offered to let any other architect decide whether it had complied with its contract so far as it had gone, and that defendant, in order to get plaintiff's work and materials for nothing and to break it down, feigned the excuse that plaintiff was not performing its contract, in order to take possession of said building and plaintiff's materials. Plaintiff alleged that in good faith it was performing the contract, and that defendant wrongfully took possession of said building and materials and refused to allow plaintiff to fulfill its contract and complete the job.

The trial resulted in a judgment in favor of plaintiff for $7382.47.

It would be tedious and serve no useful purpose for us to undertake to analyze the evidence with regard to plaintiff's strict compliance in every particular with the plan and specifications in constructing the house as far as it had proceeded when Linch declared the contract forfeited and took charge of and completed it himself.

The plaintiff introduced much evidence tending to show that the material used and the work performed by it were both of the first class and as near in compliance with the contract as a whole and in detail as was possible.

On the other hand the defendant introduced evidence showing that in a number of particulars neither the work nor the material were in strict compliance with the contract.

It is evident to us that in some particulars the material furnished by the plaintiff and the work performed by it were not in strict compliance with the terms of the contract.

It is not disputed that when Linch took charge of the building and completed it himself he varied the plan of construction in a number of particulars of some importance, and that such variance occurred in the reconstruction of the first story built by plaintiff, which Linch had partly torn down.

It is evident that in some particulars the witnesses of the defendant, who point out defects of construction committed by plaintiff, refer to differences between its work and that subsequently performed by Linch, and not by comparing it with the plans and specifications by which plaintiff was working. In more than one particular in which the defendant claimed and introduced evidence to prove that work or material did not conform to the contract, plaintiff offered evidence tending to prove that the particular was not covered, as contended for by defendant, by the plan or specifications.

There was some evidence tending to show that the architect of the defendant, under whose supervision the work was proceeding, was present and had knowledge of the character of work and material used which were subsequently objected to, without making objection to them at the time of their use.

Without ourselves undertaking to deal with every aspect of the case in which there exists some conflict, both under the pleadings and the evidence, we think it proper to confine our further consideration of the cause to the points principally discussed in the briefs of counsel and presented by appellant's assignment of errors in the order of their presentation.

The first assignment reads as follows: "The ruling of the court in admitting the evidence of W. H. Wilson and of A. J. Deal (over appellant's objection) referred to and shown in bills of exception Nos. 2 and 3."

Bill of exceptions No. 2 shows that the evidence objected to by the defendant and admitted by the court was that "the iron front placed in the building by plaintiff was substantially like Pullis' No. 47." The objection made was that the "evidence was not material or relevant."

Bill of exceptions No. 3 shows that "on the trial W. H. Wilson, a witness for plaintiff, was shown the architect's plans of the building, referred to in the pleadings of this case, and his attention being called by plaintiff's counsel to the base of the columns as shown and marked on said plans, he was asked by plaintiff's counsel to take a rule, measure the diameter of the base of the columns as shown by the plans to the scale of measurement, and then to state to the jury what would be the proper diameter of the base of a column to set on such plans." The question was objected to on the ground "that the specifications fixed the character and size of the column called for."

Questions about the Pullis Bros'. intermediate No. 47 columns are the ones most discussed in the case, both upon the original submission and upon the motion for a rehearing.

We think it very clear that by the use of the expression, "the above numbers refer to Pullis Bros'. Catalogue," the parties did not contract for the use of columns made by Pullis Bros. to the exclusion of those made by any other manufacturer. If such had been intended.

nothing would have been easier than to express that purpose in so many words. We do not construe the expression to mean more than that in using columns of the dimensions specified those represented in the Pullis Bros'. Catalogue should be adopted as models. The contractor did not put in Pullis Bros'. No. 47 columns for the reason alone, it appears, that the cost of procuring them was greater than it was willing to pay. Instead of that plaintiff put into the building columns made by another party. The architect of the maker of the last named columns testified that his house furnished the iron for plaintiff to put in defendant's house; that the plans and specifications were before him when his house made the iron front, and that the work conformed with the plans and specifications as nearly as it was possible for human skill to make it; that he was superintendent of the iron works and made a drawing of Pullis Bros'. No. 47 on tracing paper from Pullis Bros'. Catalogue and made the work accordingly; that every house of any importance has its own catalogues but they all use each other's cuts; that the columns were made of iron three-quarters of an inch in thickness and were in every respect a first-class job; that the moldings were curtailed from Pullis Bros.; that the ornaments on the columns made by his house were cast on, while those on the columns afterward purchased by defendant from Pullis Bros. and substituted for them were raised and attached by screws; that the base of the columns afterward substituted by defendant was 14 or 15 inches, while the base of those made for and used by plaintiff was only 12 inches; that the columns made by the employer of the witness for plaintiff were fluted, while those subsequently used by the defendant were fluted and reeded; that the column made by the house of the witness was a fac simile of the cut in Pullis Bros'. Catalogue, but the column subsequently used by the defendant was Pullis Bros'. No. 47, larger at the base than plaintiff's; that the plans and specifications gave no dimension of the base of the column; that Pullis Bros'. Catalogue did not give the dimension of the base of the column; that the size of the sill on which the defendant placed the column substituted by him was about 24 inches, while the plans and specifications called for one 18½ inches; that the base of the column made by the house of the witness was as large as could be placed on the sills called for in the specifications.

The witness Deal, who described himself as the "contractor" for the plaintiff, testified that "the iron sills and iron work was the best ever brought to Paris. They were put up in a first-class manner. He saw the work as it went up; it was done in accordance with the plans and specifications as near as possible; that the columns bought and work done by plaintiff were as strong and as good as were the columns and work afterward used by the defendant, and as near Pullis Bros.' No. 47 as could be made."

McGinnis, the supervising architect of the building, testified that "the columns defendant put in the house have a base of 15½ inches; are fluted up a portion of the way, and reeded a portion. The ornaments represent leaves projecting out and are screwed on. The base of the columns put in by plaintiff is 12½ inches. The ornaments are molded into the iron and do not project. The front put in by defendant is much heavier than the one put in by plaintiff. I objected to the work at the time it was done and notified plaintiff's agent that I would not receive the columns, but he, kept right on. The corner columns that defendant put in are 16 x 16 and 21 inches at the base. They would not sit well on an 18-inch sill. They could not sit on that width sill and make a job. Pullis told me he could not put it on that width sill and make a job."

Another witness for the defendant testified that the "strength of a column depends on the weakest part of it. The Pullis Bros.' No. 47 front put in by defendant is between three and four hundred pounds heavier than the front put in by the plaintiff. I don't suppose there would be any difference in the strength of them. You could not put a 24-inch column on an 18-inch sill and make a good job."

Witnesses testified that no diameter of the base of No. 47 was given in the catalogue of Pullis Bros. In the cut brought up as part of the record we are not able on inspection to detect one. On the margin of the cut the following words occur in print: "These columns can be made any length and any diameter except those whose diameters are marked." We understand the testimony of one of the Pullis brothers to amount substantially to the same thing.

One witness testified to expressions of admiration made use of by the architect McGinnis with regard to the iron work, including the columns, put into the building by the plaintiff, after they were brought to the ground and before they were used.

The witness Wilson was an educated architect and testified as an expert that Pullis Bros.' Catalogue shows nothing to give size of base; that the base could be large or small; that the scale would show about a 9-inch base.

We do not understand it to be contended that any figures are given in the plan or specifications expressly stating the dimensions of the base of the columns. The middle diameters and the lengths of the intermediate columns are given, and we do not understand that it is denied that the columns used by plaintiff corresponded with these dimensions. The specifications having fixed the size of the sills upon which the columns were to stand at 18½ inches, and the diameter of the base of the columns not having been fixed, we are unable to see why it was not proper to make the base correspond with the width of the sill upon which it was to rest. The evidence of Wilson to which the exception relates was addressed to this issue.

The objection made to the evidence, "that the specifications fixed the character and size of the column," in so far as it related to the particular part of the column affected by the evidence, we do not find supported by the record.

The objection to permitting the witness Deal to testify that the "iron front placed in thé building by plaintiff was substantially like Pullis' No. 47," could only have been predicated upon the proposition that the contract required the use of columns made by Pullis Bros. instead of its only requiring, as we construe it, that they should be modeled after those represented in their catalogue.   We conclude that both objections were properly overruled.

Another controverted question on the trial was with regard to the relative strength of the Pullis Bros.' columns and those used by plaintiff, and as affecting that issue evidence was given as to the thickness of each.

While unloading the Pullis Bros.' columns afterward used in the building by the defendant one of them was broken, and a piece of it seems to have been used at the trial as evidence on this issue without objection.

The second error assigned reads as follows: "The action of the court in permitting the jury, over defendant's objection, to carry with them to the jury room certain pieces of iron offered in evidence by plaintiff, but not described in the evidence or identified or otherwise shown to be material or pertinent, because the same was improper and calculated to prejudice and mislead the jury."

The objection appears substantially in the same terms in the bill of exceptions, which further shows that while the objection was made within the hearing of the court by inadvertence no ruling was made upon it by the court.

Before a reversal should be had for such a cause we think it should appear that a ruling of the court had been sought with greater diligence than seems to have been exercised in this instance.   The objections assigned are such as would have been more properly urged to the introduction of the evidence than to its being carried with them by the jury in their retirement.   But however or whenever made we do not think that there was error committed in the admission of the evidence, and if the court had ruled that it might be taken by the jury in their retirement we think it could not have been held by us any abuse of the court's proper discretion in such matters.

Appellant's third and last assignment of error reads as follows:

"1. The court erred in overruling defendant's motion for a new trial in this:   The first clause of the charge of the court, as well as subsequent clauses thereof, charged the jury that a substantial compliance with plaintiff's contract, according to said contract, plans, and specifications, is and was all that was required of plaintiff, when the contract

itself requires a strict compliance in every particular and admits of no variance in any particular, and the court ought to have granted a new trial.

"2. The court erred in the third clause of its charge to the jury in this: That substantial compliance with plaintiff's contract is all that is necessary, and that the jury are to construe the contract by a fair, reasonable, and practical construction, and if any conflict appears between the contract, plans, and specifications, they should reconcile them in a 'practical, workmanlike manner,' etc., because said charge deprived appellant of his rights under the contract—gave too much latitude to the jury and left the construction of a written contract to them, to be construed by them in a practical manner as workmen, not as jurors—without defining what was meant by such manner of construction, and the jury was likely misled by such charge.

"3. The court erred in the fourth clause of the charge to the jury in this: It is in effect charged that in a certain event they ought to allow the defendant Linch the reasonable cost of completing the building after he took charge of it, instead of its actual cost to him. The undisputed proof shows that it actually cost him $20,484.72 exclusive of any of plaintiff's material used therein.

"4. There was no evidence to show that plaintiff was proceeding with the work according to the contract, plans, and specifications at the time defendant Linch took charge of the building, nor that plaintiff was entitled to recover on the contract sued on.

"5. The plaintiff sued for a breach of contract on the part of defendant and alleged a strict compliance on its part, but the court's charge to the jury makes a better contract for the plaintiff than it claims and virtually inserts in the contract the word 'substantial' without any explanation of the term or what was meant by it in that connection, which was calculated to mislead the jury.

"6. In the fifth charge of the court the production of the certificate of the architect or superintendent was rendered unnecessary, as provided for in article 8 of the contract, if the jury believed that plaintiff had substantially complied with its contract, without any reason being given in either the pleading or evidence why it was not produced or showing that it was fraudulently, collusively, or wrongfully withheld from the plaintiff."

The charge referred to in the second clause of the assignment reads as follows: "In deciding whether or not plaintiff was proceeding with said building in compliance with the contract, you are instructed that there must have been a substantial compliance in every material particular in each item as called for by a fair, reasonable, and practical construction of the contract, plans and specifications taken together, and where there is a conflict, if any, in these, this should be reconciled

in a practical, workmanlike manner, so as to arrive at the fair and reasonable intention of the same."

The objection to the part of the charge that instructs the jury that the evidence must show a substantial compliance of plaintiff with the terms of the contract rests upon the proposition that a literal performance was required in each and every particular. Such precision can not, we think, be demanded in the performance of contracts or any other affair of life. To decline to go to such a length is not by any means to contravene the well established rule that "as men bind themselves so must they stand bound," nor diminish the force of that other rule stated in the case of Menard v. Sydnor, 29 Texas, 257: "When the terms of a contract are free from ambiguity, and not such as are against the policy of the law to enforce, they establish the rights of the parties in the subject matter which will be protected and enforced by the courts:"

Upon this subject the Supreme Court of New York, in the case of Smith v. Gugerty, 4 Barbour, 620, uses the following language: "If there is an honest effort to perform the contract according to the letter and it is substantially fulfilled, the builder should be entitled to receive the reward of his labor although he may not (as the architect employed in this case has certified) have in every instance complied with its terms literally in every punctilio. A substantial compliance without any intentional variation should in all cases be considered as a full performance of a condition, whether precedent or subsequent."

In the case of Woodruff v. Hough, 91 United States, 602, the Supreme Court of the United States says: "The court repeated the details of the contract on the points where the failure was alleged, and then told the jury that unless the contractor had complied substantially with these specifications or a strict compliance therewith had been waived they could not recover. We do not find in it (the charge) any error."

We do not think that the charge above quoted, in which occurs the words "practical construction," submitted to the jury the duty of construing the written contract. The questions in dispute did not relate so much to the meaning of the contract as they did to whether it expressed anything at all with regard to some of the matters in controversy. Upon such questions as did exist skilled witnesses had testified with regard to what the contract did or did not express, and upon that evidence it was the province of the jury and not of the court to pass. Conflicts in the evidence, whether it was given by witnesses or appeared in the plans and specifications as interpreted in the light of their evidence, had to be reconciled, if at all, by the jury. It has not been pointed out to us wherein the contract demanded the construction of the court in its charge. If in the opinion of the defendant there was anything requiring such a charge instead of the one given, we think it would have been proper, in view of the intricate and voluminous char-

acter of the contract, for the defendant to have directed the attention of the court to the point by a request.

The disposition of the case makes the third ground of objection immaterial, but if it was otherwise we do not find any error in the charge.

We think the court correctly held that the clause of the contract with regard to the production of the architect's certificate as a prerequisite to the right of the plaintiff to collect its pay for performing it can not be held to relate to or defeat its right to recover damages for a breach of the contract when the evidence shows that there has been a breach and that it has been damaged thereby so as to be otherwise entitled to recover.

We think it proper to advert to another feature of the case. The employer expressly reserved the right in the contract to "appoint a superintendent or inspector," and upon the failure of the contractor "to comply with the requirements of this contract," after giving ten days' notice of his intention to do so, either to complete said improvement (himself) at the expense of the contractor or to entirely avoid the contract and bring suit for damage, in which latter case all work done and materials on the ground are to become the property of the employer without any further payment therefor." "Any material condemned must be immediately removed from the building and grounds and any work that may be condemned must immediately be made good."

There is evidence going to show that this superintendent or inspector was appointed and that he was present and had knowledge of the character of material that was being placed in the improvement by the plaintiff as well as of the character of the work being done by him. It is difficult to consent to the proposition that with power to put an end to the contract at any time and take as a forfeit all work and material furnished by plaintiff up to the declaration of the forfeiture the defendant could stand by, either with or without objections, and see the work proceed, and by simply postponing the declaration of forfeiture gain all that was being added to the improvement.

Viewing the contract as a whole, it seems to be more consistent with the intention it was designed to express to construe it as meaning that whenever a cause for forfeiture should occur it should be then promptly declared and proceeded with, or, in the language of the contract, the faulty material should have been then "immediately removed from the building" and the condemned work "immediately made good," or the failure to do so considered as an acquiescence and waiver at least of the right to forfeit for that part of the undertaking. The right to recover damages for faulty construction or any violation of the contract would not necessarily be subject to the same rule.

Without undertaking to reconcile all of the evidence in the cause or even to say on which side it preponderates, we are of the opinion that the verdict is sufficiently sustained by the evidence to require us to let

it stand so far as the issues of fact are concerned, and believing that no error was committed by the court in its charge or other rulings, we are of the opinion that the motion for a rehearing should be granted and that the judgment should be affirmed.

*Affirmed.*

Delivered January 23, 1891.

*Willie, Mott & Ballinger* argued a motion for a second rehearing by appellant. The motion was refused.