**ASHFORD PARTNERS,
LTD., Petitioner,**

v.

**ECO RESOURCES, INC., Respondent.**

No. 10–0615.

Supreme Court of Texas.

Argued Feb. 8, 2012.

Decided April 20, 2012.

Rehearing Denied Oct. 26, 2012.

Charles R. "Skip" Watson Jr., Mike A. Hatchell, Locke Lord Bissell & Liddell, L.L.P, Austin, Sara Murray, Marc J. Schnall, Steven B. Treu, Langley & Banack, Inc., San Antonio, Philip Dermot Rigg, Dermot Rigg, P.C., Sugar Land, for Ashford Partners, Ltd.

Michael P. Cash, Roberto J. Montoya, Gardere Wynne Sewell LLP, Houston, for Eco Resource, Inc.

Justice MEDINA delivered the opinion of the Court.

This appeal is from a judgment awarding a tenant damages for a landlord's breach of a construction-related duty under a build-to-suit lease agreement. The tenant sued asserting that the landlord's failure to adhere to construction plans resulted in a substandard building, diminishing the value of its leasehold. At trial, the parties disagreed about the appropriate measure of damages for the landlord's breach. The tenant maintained that damages should be measured by the diminished value of the leasehold. The landlord contended that the appropriate measure should be the cost to repair the building. The court of appeals sided with the tenant, concluding that diminished value was the appropriate measure of damages for the landlord's breach of a construction-related duty under the lease. 379 S.W.3d 300 (Tex.App.-Houston [1st Dist.] 2010) (mem. op.). We, however, agree with the landlord that the cost of repair is the appropriate measure under the circumstances of this case. Because under the appropriate measure there is no evidence that the tenant has been damaged, we reverse and render.

## I

In March 2001, ECO Resources, Inc., a provider of water and wastewater treatment services, signed a lease agreement with TA/Sugar Land–ECO, Ltd. (TASL) for the construction of a 32,000 square foot office building and laboratory. While the building was under construction, TASL agreed to sell the property to Ashford Partners, Ltd. The Ashford/TASL earnest money contract provided that the ECO lease would be assigned to Ashford within thirty days after it commenced.

ECO's lease was to begin when the building was substantially complete and a certificate of occupancy issued. The lease defined "substantially completed" to "mean that such improvements have been substantially completed in accordance with the Plans, subject only to completion of minor punch list items." The tenant was responsible for inspecting the construction and providing the punch list. The lease further provided that:

> Subject to Lessor's completion of such punch list items, the taking of possession by Lessee shall be deemed to conclusively establish that the buildings and other improvements had been completed in accordance with the Plans, that the Premises are in good and satisfactory condition as of when possession was taken, and that Lessee has accepted such buildings and other improvements.

Finally, the lease directed the landlord to use reasonable efforts to complete the tasks on the tenant's punch list within thirty days of receipt.

On September 28, 2001, ECO accepted the building as substantially complete, submitting an eight-page punch list of items in need of repair to TASL. About this same time, ECO received formal notice of the property's pending sale in a document entitled "Notice of Assignment of Lease and Estoppel Certificate." ECO promptly executed the estoppel certificate, as its lease required,[1] and returned it a mere twelve days after submitting its punch list to TASL. Two weeks later, Ashford became ECO's landlord. Four days after that, the deadline for completing ECO's punch list expired. At least one repair on the punch list, a requirement for caulking between the tilt wall panels under grade, had not been performed.

Two years passed, and ECO began to have problems with the building. Ashford hired engineers to investigate, and they determined that water had collected under the foundation. The cause for this was traced to the failure to caulk between the tilt wall panels below grade, the omitted repair on ECO's punch list.

Ashford spent over $313,000 to make repairs and correct the problem and then sued the construction contractor that TASL had used on the project. Ashford also joined ECO as a defendant, seeking a declaratory judgment that the building was structurally sound and that ECO was not entitled a reduction in rent. ECO counterclaimed for breach of the lease, asserting that Ashford as successor landlord assumed the original lessor's obligations under the lease, including the duty to construct the building according to plans.

Ashford subsequently settled with the construction contractor and also dismissed its suit against ECO. ECO did not abandon its claim, however, and the case proceeded to trial. At this trial, a jury was asked the following three questions:

1. Did Ashford fail to comply with the Lease by failing to cause the Leased Space to be constructed pursuant to the Plans?

2. Did Ashford fail to comply with the Lease by failing to maintain the foundation of the Leased Space in good repair?

3. What sum of money, if any, if paid now in cash would fairly and reasonably compensate ECO Resources for the damages, if any, that resulted from Ashford's failure to comply with the Lease?

The jury answered "Yes" to the first question and "No" to the second, finding Ashford had breached a construction-related duty under the lease but not its duty to maintain the foundation in good repair.[2]

In the third question on damages, the jury was instructed to base its award, if any, on the difference "between the rent required under the Lease and the rental value of the Leased Space in its actual condition." The jury found the diminished value of the lease to be $1,027,704. Adding interest and attorney's fees,[3] the trial court rendered a total judgment of $1,494,462.25 in favor of ECO. Ashford appealed.

The court of appeals concluded that Ashford had assumed a duty to oversee

---

1. The lease required ECO to execute an estoppel certificate, verifying the lease's validity and other matters, within ten days of the landlord's request.

2. The lease obligated the landlord to keep the building's foundation, walls, and roof in good repair.

3. The parties stipulated to $407,046.20 as a reasonable and necessary attorney's fee in this case.

the completion of the punch list and bore responsibility for the omitted repair because it was ECO's landlord when the punch-list repairs came due. 379 S.W.3d at 306. The court further found the diminished value of the lease to be an appropriate measure for Ashford's breach of this assumed construction-related duty. *Id.* at 308. The court of appeals accordingly affirmed the trial court's judgment.

## II

Ashford complains that the judgment in ECO's favor is erroneous because there is neither evidence that Ashford breached any duty under the lease nor that ECO suffered any damages as a consequence. Ashford argues that it did not breach any construction-related duty because the building's construction was complete before it became ECO's landlord. Even assuming that construction-related duties remained to be performed under the lease, Ashford next contends that the assignment of the lease in conjunction with ECO's estoppel certificate cut off any such duties. Finally, even if the estoppel certificate did not cut off all remaining construction-related duties, Ashford maintains there is no evidence that ECO suffered any damages when the appropriate measure of damages is applied to its case.

### A

Ashford's first two arguments rely primarily on ECO's estoppel certificate, which Ashford obtained before taking the lease assignment. Ashford submits that ECO represented in this document that the building's construction had been completed to its satisfaction. As pertinent here, the document recited that ECO was in possession of the premises, that the 25–year lease term had begun on October 1, 2001, and that:

Tenant has accepted the Premises without exception, except for undisclosed defects, and all requirements for the commencement and validity of the Lease, including all construction work, if any, required of the Landlord under the terms of the Lease have been satisfied.

Because ECO "accepted the Premises without exception, except for undisclosed defects" and the items on its punch list were not undisclosed defects, Ashford concludes that it did not assume responsibility for completing ECO's punch list.

ECO responds that Ashford's reading of the estoppel certificate is contradicted by the document's express disclaimer of any intent to "impair or diminish any of Landlord's obligations to Tenant under the Lease." Ashford's interpretation clearly diminishes ECO's rights under the lease. Moreover, ECO submits that the estoppel certificate is not inconsistent with its rights under the lease because the punch list's completion was not a prerequisite to the commencement and validity of the lease nor was the landlord in breach of its punch-list obligations when ECO executed the document. ECO contends that the certificate's purpose was merely to facilitate the sale of the property by confirming the validity of its lease and that the document did not otherwise affect its rights under the lease.

▇ Ashford's interpretation of the estoppel certificate is indeed difficult to reconcile with the document's disclaimer of any intent to "impair or diminish" the landlord's obligations under the lease. But even were we to accept Ashford's interpretation as a reasonable alternative, it would gain nothing. It would merely mean that the document was ambiguous, making its ultimate meaning a fact question, which the fact finder has already implicitly decided in ECO's favor. *See J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex.

2003) (noting that an agreement that is susceptible to more than one reasonable interpretation "is ambiguous, creating a fact issue on the parties' intent"). Accordingly, we reject Ashford's first two complaints regarding its construction duties under the lease and the effect of the estoppel certificate on those duties.

### B

Ashford also complains that the jury instruction in Question 3 submitted an erroneous measure of damages. Ashford argues that ECO's damages should be measured as in other cases involving construction deficiencies, since it has been held to have breached a construction-related duty. A contractor who has substantially performed its contract, but whose performance is deficient in some respect, is generally responsible for the cost of repair. Similarly, Ashford argues that the appropriate damages measure for a substantially-completed building under a build-to-suit lease is the cost to cure a remedial defect.

The court of appeals, however, disagreed. Focusing on the basic nature of the landlord-tenant relationship, it concluded that the usual measure of damages for the breach of a real estate rental agreement is " 'the difference between the agreed rental and the reasonable cash market value of the leasehold.' " 379 S.W.3d at 308 (quoting *Rainwater v. McGrew*, 181 S.W.2d 103, 105–06 (Tex.Civ. App.-Waco 1944, writ ref'd w.o.m.)). The court reasoned that cost of repair would only benefit the property owner, Ashford, and that the difference-in-value measure was therefore necessary to compensate ECO for its loss. *Id.*

Under a build-to-suit lease, the lessor wears two hats, functioning as both the tenant's construction contractor and landlord. Under this arrangement, the prop-erty owner agrees to construct a building to the tenant's specifications, and the tenant agrees to lease the building for a term sufficient to permit the owner a profit. Although Ashford apparently intended to assume only the latter role, the assignment and estoppel certificate failed to eliminate some lingering construction-related issues.

■ Recognizing that discrepancies inevitably arise during construction, the doctrine of substantial completion generally controls the measure of damages for failure to make repairs or complete construction. *See Warren v. Denison*, 563 S.W.2d 299, 303 (Tex.Civ.App.-Amarillo 1978, no writ) (citing *Linch v. Paris Lumber & Grain Elevator Co.*, 80 Tex. 23, 15 S.W. 208 (1891)). Substantial completion has been described as the "legal equivalent of full compliance less any offsets for remediable defects." *Uhlir v. Golden Triangle Dev. Corp.*, 763 S.W.2d 512, 515 (Tex. App.-Fort Worth 1988, writ denied). Once a construction project has been substantially completed, the damages for errors or defects in construction "is the cost of completing the job or of remedying those defects that are remediable" without impairing the building as a whole. *Vance v. My Apartment Steak House of San Antonio, Inc.*, 677 S.W.2d 480, 482 (Tex.1984). On the other hand, a difference-in-value measure of damages may apply when the contractor has failed to substantially comply with the contract or when repairs will impair the structure or materially damage it. *Turner, Collie & Braden, Inc. v. Brookhollow, Inc.*, 642 S.W.2d 160, 164 (Tex.1982); *Hutson v. Chambless*, 157 Tex. 193, 300 S.W.2d 943, 945 (1957). Substantial completion, however, implies that the parties have been given the object of their contract and that any omissions or deviations can be remedied. *Turner, Collie & Braden*, 642 S.W.2d at 164–65.

■ The question then is whether the construction of ECO's build-to-suit lease was ever substantially completed. When Ashford assumed ownership, ECO was already in possession of the premises and had ostensibly accepted the building as substantially complete. Its acceptance was, of course, subject to the exceptions contained in its punch list, but if those exceptions were capable of repair, then that cost would be the appropriate measure of ECO's damage for this construction-related breach.

ECO argues, however, that Ashford's repair efforts failed to fix the problem—that even after repairs, the foundation remained unstable and continued to heave and fall. It submits that the jury's award of past and future damages for the diminished value of the leasehold is recognition of the ongoing nature of these foundation problems.

The jury, however, did not find Ashford's repairs ineffective. In fact, when asked whether Ashford failed to maintain the foundation in good repair, the jury answered, "No". Although we agree that Ashford, as ECO's landlord, had a continuing contractual duty to maintain the foundation, the damages awarded by the jury here are the product of an erroneous instruction regarding the appropriate measure rather than the recognition of the problem's continuing nature.

ECO also alluded to business disruptions caused by the foundation problems during oral argument. Such consequential damages might be recoverable in an appropriate case if caused by the breach of a construction-related duty under a build-to-suit lease. ECO, however, did not attempt to prove such damages at trial. Its theory was instead that it did not get the building it bargained for and that its damages should therefore be measured by the building it got, that is, the difference in value.

But this theory presumes that the defect could not be remedied. The doctrine of substantial completion, on the other hand, presumes that deficiencies can be repaired.

Under the lease, it was substantial completion that triggered ECO's obligation to submit its punch list of remediable defects. Substantial completion likewise entitled ECO to obtain a certificate of occupancy and commence the lease's 25–year term. The court of appeals concluded that Ashford's liability rested "exclusively" on its failure to complete a single punch list item on a substantially completed building and that the diminished value of the leasehold was the appropriate measure of ECO's damages. 379 S.W.3d at 308. We conclude, however, that cost of repair is the appropriate measure of damages to remedy an omitted item on a substantially-completed building. Because Ashford made these repairs at no cost to ECO, we further conclude that ECO has suffered no damages under the appropriate measure.

### III

ECO also obtained an award of attorney's fees under Chapter 38 of the Civil Practice and Remedies Code. The chapter pertains to the recovery of attorney's fees in breach-of-contract cases. It provides that: "A person may recover reasonable attorney's fees ... in addition to the amount of a valid claim and costs, if the claim is for ... an oral or written contract." TEX. CIV. PRAC. & REM. CODE § 38.001(8).

■ Ashford submits that ECO cannot recover attorney's fees under this statute in the absence of a valid claim or in the absence of recoverable damages. Indeed, we have said that to qualify for fees under the statute, a litigant must prevail on a breach of contract claim and recover damages. *MBM Fin. Corp. v. Woodlands Operating Co.*, 292 S.W.3d 660, 666 (Tex.2009)

(citing *Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 201 (Tex. 2004) (per curiam)). As ECO has not done this, we agree that it is not entitled to attorney's fees.

Ashford further argues that it should be awarded the attorney's fees that ECO got in the trial court. The parties stipulated below that $407,046.20 was a reasonable and necessary attorney's fee in the case. In rendering judgment on the jury's verdict, the trial court incorporated the stipulated amount into ECO's judgment. Because we must reverse ECO's underlying judgment, Ashford contends that the stipulated attorney's fees should now be awarded to it.

█ The stipulation, however, is merely an agreement as to the amount of reasonable and necessary attorney's fees in the case.[4] It was not the basis for the award of attorney's fees, nor has Ashford otherwise briefed its entitlement to such fees in this case other than to state that it too prayed for attorney's fees in the trial court. As a general rule, litigants in Texas are responsible for their own attorney's fees and expenses in litigation. *See MBM Fin. Corp.*, 292 S.W.3d at 669 (noting the prohibition on fee awards unless specifically provided by contract or statute). Because Ashford's briefing provides no basis for an exception to the general rule, its request for attorney's fees is denied.

\* \* \*

The court of appeals' judgment is reversed and judgment is rendered that ECO Resources, Inc. take nothing.

---

4. The stipulation clearly applied to ECO's attorney's fees. Whether it was also intended to apply to Ashford's attorney's fees is not entirely clear since there was no basis for such an award at the time of the stipulation and no contingency expressed for any future entitlement.