Opinion issued August 28, 2025



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-23-00825-CV

_____

**ASTRA VENTURES, LLC, Appellant**

**V.**

**SERVICE STEEL WAREHOUSE CO., L.P., Appellee**

---

**On Appeal from the 458th District Court**
**Fort Bend County, Texas**
**Trial Court Case No. 17-DCV-242991**

---

## MEMORANDUM OPINION

This dispute arises out of a project to construct an office building. After furnishing steel to be used in the construction, supplier Service Steel Warehouse Co., L.P. did not receive payment from its subcontractor, the general contractor, or the

owner of the property, Astra Ventures, LLC. Service Steel perfected a mechanic's and materialman's lien on the property and sought foreclosure of the lien. Following a bench trial, the trial court awarded Service Steel $83,318.87 in damages, awarded pre- and post-judgment interest, and ordered foreclosure of the lien limited to the amount of the damages award.

In five issues, Astra argues that (1) the trial court erroneously concluded that Astra waived its right to assert that Service Steel failed to send the statutorily required pre-lien notices and that the lien was defective because Astra specifically denied performance of these conditions precedent; (2) the court erroneously foreclosed on Service Steel's lien because the lien was invalid and Service Steel did not properly perfect the full amount of its lien; (3) the court erred in awarding monetary damages under the retainage statute and fund-trapping statute; (4) the court erred by awarding pre- and post-judgment interest; and (5) the court erred by failing to offset Service Steel's lien and damages claim against the amount Astra paid to finish the subcontractor's scope of work.

We reverse and remand the portions of the judgment relating to prejudgment and post-judgment interest and affirm the remainder of the judgment.

## Background

Atilla Tuna and his brother Omar own and operate multiple entities that are involved in commercial property ownership, development, and management. The

brothers co-own Astra, a single-purpose entity that owns real property. Omar owns OFT Enterprises, Inc., a company that manages construction projects. Atilla is the vice president of OFT. Atilla also owns Enclave Property Management, LLC, a company that manages commercial properties once they are developed. Astra, OFT, and Enclave all have offices at the same address.[1]

Astra owns commercial real property in Sugar Land, and it wanted to construct a two-story medical office building on the property ("the project"). OFT served as the general contractor.[2] In December 2016, OFT signed a subcontract agreement with Rush Steel Fabrication, LLC to provide all fabricated steel for the building. Robert Gonzalez, Rush's president, agreed to a subcontract price of $304,000 for this work, although $120,000 of this amount would be paid directly to a different vendor for certain steel pieces.

Service Steel is a steel distribution company that buys steel, holds it in a warehouse, and then sells it to individual projects. Rush had an existing account with Service Steel. In March 2017, Rush approached Service Steel and asked for price

---

[1]     Service Steel named OFT and Enclave as defendants in the underlying proceeding. In its final judgment, the trial court ordered that Service Steel, OFT, and Enclave "take nothing by way of their claims by and against each other." OFT and Enclave are not parties to this appeal.

[2]     The record does not include a written contract between Astra and OFT. Atilla Tuna testified that it cost "around $4 million" to construct the building, excluding the cost of the land.

3

quotes on various pieces of steel for the project. After Gonzalez indicated that the steel was for a new project, Service Steel had him complete a "Job Information Sheet" with information about the project. Gonzalez named the project and listed OFT as the general contractor and Enclave as the project owner. In a space for "Sub Contractor (our customer)," he listed "Rush Steel Fabrication DBA Ipsum." Above his signature, he stated the "Customer Name" as "Rush Steel Fabrication – Robert Gonzalez/Owner."

Service Steel employees testified that the company was aware of several names that Gonzalez used for his business, including "Rush Steel Fabrication," "Rush Steel," "Ipsum Builders," "Ipsum Building Supplies, "Ipsum Steel," and "Ipsum Rush Steel."[3] Service Steel used the name "Ipsum Building Supplies" on its invoices for this customer at Gonzalez's request.

Service Steel's invoices and sales orders indicated that the steel was billed and shipped to "Ipsum Building Supplies" at an address in Houston that closely corresponded with Rush's address listed on its subcontract agreement with OFT. The invoices referenced a "Customer Purchase Order" that matched the "Job #" listed on

---

[3]    The trial court admitted an assumed name certificate submitted by Rush Steel Fabrication, LLC that stated it intended to conduct business under the name "Ipsum Steel." This document was filed with the Harris County Clerk. The trial court also admitted evidence that "Ipsum Building Supplies and Services, Inc." was an entity formed by Gonzalez and Ruben Mercado, Mercado was listed as the entity's registered agent, and a legal dispute arose between them concerning this entity.

the Job Information Sheet that Gonzalez completed for Service Steel. The invoices also named the project and listed OFT as the general contractor and Enclave as the owner. According to its invoices and sales orders, Service Steel delivered over $83,000 worth of steel to Rush for the project during March, April, May, and June 2017.

The project was not the only construction job during Spring 2017 with which OFT, Enclave, Rush, and Service Steel were all involved. They also all worked together on a job in Harris County called Icon. Unfortunately, the working relationship between Rush and OFT quickly deteriorated on both projects.

Atilla Tuna testified that by early March 2017, Rush had made no deliveries of steel to the project despite a subcontract completion date looming later that month. He sent a "Notice of Corrective Action" to Rush and Gonzalez, demanding that Rush "take immediate action to cure all the issues jeopardizing the project."[4] Although Rush then delivered around $36,000 worth of steel to the project, many pieces were "not fit for the project," and it did not deliver any steel after April 20, 2017. Gonzalez "disappeared on us, and then he abandoned the job, and [OFT was] forced to terminate it." OFT could no longer contact Gonzalez by "any means of communication." According to Tuna, OFT advised Service Steel of Rush's shortcomings in "late April."

---

[4] This notice does not indicate whether Rush received it.

Meanwhile, Rush had not paid Service Steel for steel delivered on both the project and the Icon job. The trial court admitted several email exchanges between OFT employees, Rush employees, and Service Steel employees concerning the outstanding balances. In an email dated May 11, 2017, an OFT employee emailed two attorneys at Service Steel and stated, "I'd like to get status on what IPSUM/Rush Steel owes for The ICON exclusively. And if any payments have been made." A Service Steel employee then shared a list of outstanding invoices for the Icon job. On May 15, 2017, a Rush employee addressed the Icon project and stated that once Service Steel received payment for that project, OFT "will receive a lien release from Ipsum dba Rush Steel for the amount of the check recovered." The employee then stated:

> Sugar Land Payment
> In addition we are seeking payment for [Sugar Land] today, we invoiced Sugar Land back in March and still have not received payment. We now have a substantial amount of steel equaling thousands of dollars stored in our warehouse that has been ready for delivery for some time, this steel has been verified by Enclave staff.

Throughout the rest of May, these employees continued discussing payment to Service Steel for the steel provided to Rush for the Icon job.[5] On June 7, 2017, the OFT employee asked Service Steel to send "Centre at Sugar Land [the project] invoices, paid and unpaid for [I]psum." A Service Steel employee sent a list of 21

---

[5]     Although Service Steel filed a mechanic's lien for the Icon job, OFT ultimately paid that lien.

invoices, all of which were unpaid, reflecting an outstanding balance of $80,158.87. Service Steel sent Rush two additional deliveries of steel over the following two days. When these amounts were added, Rush's total outstanding balance with Service Steel was $83,318.87.

Service Steel sent its first pre-lien notices to OFT, Enclave, and Rush—as "Ipsum Building Supplies"—via certified mail on May 15, 2017. The notices identified the project as "Centre at Sugar Land," Enclave as the owner, OFT as the contractor, and Ipsum Building Supplies as the subcontractor. The notices stated that the claim related to six unpaid invoices from March 2017 totaling $11,152.73. The notices instructed the owner "to withhold all payments owed to the original contractor on this project" and warned that if the claim remained unpaid, the owner may be personally liable and its property subject to a lien unless the owner withholds payment from the original contractor. The return receipts reflected that the notice to Enclave was delivered, the notice to OFT was forwarded to the address of Enclave's office, and the notice to Ipsum Building Supplies was not deliverable.[6]

On June 15, 2017, Service Steel sent pre-lien notices to OFT, Enclave, and Ipsum Building Supplies relating to seven unpaid invoices from April 2017 totaling

---

[6] Service Steel sent the notices for OFT and Enclave to different addresses. Atilla Tuna testified that Astra, OFT, and Enclave all had offices on Terminal Street in Bellaire, but they had previously all had offices on Bintliff Drive in Houston. Service Steel sent the notice to OFT at the Bintliff address and the notice to Enclave at the Terminal address.

$39,587.88. These notices contained the same information concerning the project, owner, contractor, and subcontractor. They also included the same language requesting that the owner withhold funds from the original contractor for payment of this claim and warning of the consequences for failure to withhold payment. Once again, the notice to Enclave was delivered, the notice to OFT was forwarded to Enclave's address, and the notice to Ipsum Building Supplies was returned as undeliverable.

Service Steel sent two sets of pre-lien notices to OFT, Enclave, and Ipsum Building Supplies on June 28, 2017. The first set of notices related to six unpaid invoices from May 2017 totaling $28,424.15. The second set of notices related to four unpaid invoices from June 2017 totaling $4,154.11. Aside from the invoices and the amount of the claims, these notices were substantively identical to the notices that Service Steel sent on May 15 and June 15. Service Steel sent these notices to OFT at the address of Enclave's office. They were delivered.

On June 29, 2017, Service Steel's counsel filed an affidavit for mechanic's and materialman's lien in the Fort Bend County real property records. The affidavit stated:

> During a normal course of business dealing with Ipsum Building Supplies, ("Ipsum"), Claimant [Service Steel] supplied structural steel construction materials including, but not limited to beams, plate, angle, tubing, bar, merchants, and channel to Ipsum at a construction project known as the Centre at Sugar Land . . . .

8

Service Steel listed its business and mailing address, named Enclave as the "owner or reputed owner" of the property, named Astra as the owner or reputed owner in the alternative, and named OFT as the general contractor. Service Steel identified "Ipsum Building Supplies"—with a P.O. Box located in Houston—as the "person or entity who ordered the materials from claimant." Service Steel stated that it furnished materials in March, April, May, and June 2017. It further stated that it provided notice of the claim to OFT, Enclave, and Ipsum Building Supplies via certified mail on May 15, June 15, and June 28, 2017. Service Steel averred that $83,318.87 remained unpaid, and it claimed a lien on the property in that amount.

That same day, Service Steel notified Enclave, Astra, OFT, and Ipsum Building Supplies via certified mail that it had filed a lien affidavit. The notices to Enclave and OFT were delivered. For Astra, Service Steel used the address that it had used to send the first two pre-lien notices to OFT. The lien notice to Astra was returned as undeliverable. The lien notice to Ipsum Building Supplies—which used the same P.O. Box as listed in the lien affidavit itself—was also returned undeliverable.

Service Steel sued Astra, OFT, and Enclave on the same day that it filed its lien affidavit.[7] Service Steel requested an order establishing its mechanic's lien against the property in the amount of $83,318.87 and foreclosure of that lien. It also

---

[7] Service Steel did not name Rush as a defendant.

sought recovery of 18% prejudgment interest under both the Prompt Payment Act[8] and its contract with Rush, and it sought recovery of post-judgment interest. In later amended petitions, Service Steel alleged that a "sham contractor" relationship existed between Astra and OFT because these entities (and Enclave) were all "owned, controlled and operated by the same principals." Service Steel also added a request that the court "order payment of its claim for retainage, funds trapping and lien obligations by Owners and the General Contractor, OFT."

A bench trial occurred in September 2023. Two employees of Service Steel testified, as well as Atilla Tuna. One of the primary topics of the witnesses' testimony related to Rush and the names under which it did business. Witnesses also testified about the actions taken by both OFT and Service Steel after Rush stopped complying with its contractual obligations, including the email exchanges discussed above. The trial court admitted these emails, Service Steel's invoices and sales orders, the pre-lien notices sent during May and June 2017, the lien affidavit, and the notice of the lien.

---

[8] *See* TEX. PROP. CODE § 28.002(a) ("If an owner or a person authorized to act on behalf of the owner receives a written payment request from a contractor for an amount that is allowed to the contractor under the contract for properly performed work or suitably stored or specially fabricated materials, the owner shall pay the amount to the contractor, less any amount withheld as authorized by statute, not later than the 35th day after the date the owner receives the request."). The Prompt Payment Act provides that interest begins to accrue on an unpaid amount on the day after the payment becomes due, and the unpaid amount bears interest at the rate of 1 1/2 percent each month. *Id.* § 28.004(a)–(b).

Several weeks after trial, the trial court signed findings of fact and conclusions of law. Under a section called "Final Awards," the trial court awarded Service Steel $83,318.87 in damages against Astra and awarded pre- and post-judgment interest. Concerned that the findings and conclusions may have included finality language, Astra filed a notice of appeal even though the trial court had not yet signed a final judgment.

The trial court did not sign a final judgment until April 2024. In the final judgment, the trial court awarded Service Steel $83,318.87 in damages, as well as prejudgment interest and post-judgment interest at a specified per diem rate. The court ordered foreclosure of Service Steel's mechanic's lien, limited foreclosure to the amount of $83,318.87, and ordered that the proceeds of the foreclosure sale "be applied against the damages award in the amount of $83,318.87 rendered above."

**Standard of Review**

We apply well-established standards of review to a trial court judgment following a bench trial. If the trial court enters findings of fact and conclusions of law, we defer to the court's factual findings that are supported by the record, and we review conclusions of law de novo. *Sw. Elec. Power Co. v. Lynch*, 595 S.W.3d 678, 683 (Tex. 2020); *see also City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005) (stating that "[t]he final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict

11

under review" and that we must credit favorable evidence if reasonable jurors could and disregard contrary evidence unless reasonable jurors could not); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam) (stating that in factual sufficiency review, we must consider and weigh all evidence and should set aside verdict "only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust"). If a trial court's conclusion of law is erroneous but the court rendered the proper judgment, the erroneous conclusion does not require reversal. *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002).

**Validity of Mechanic's Lien**

In its second issue, Astra argues that the trial court erred by foreclosing on Service Steel's mechanic's lien because the lien was invalid. Specifically, Astra contends that Service Steel failed to identify the person who employed Service Steel or to whom it furnished materials and Service Steel failed to send pre-lien notices to Astra. Astra also argues that even if Service Steel's lien was not fatally defective, the trial court erroneously determined that Service Steel properly perfected the full amount of its lien. As part of this sub-issue, Astra argues that it had entered into a "sham contract" with OFT, thus elevating Rush Steel to an original contractor— rather than a subcontractor—which affected the amounts that Astra was required to retain under the retainage and fund-trapping statutes.

In its related third issue, Astra argues that the court erred by awarding monetary damages to Service Steel because (1) the only remedy under the retainage statute is a lien, not damages; (2) Service Steel did not send the proper notice to Astra under the fund-trapping statute; and (3) even if liability is proper under these statutes, liability is limited to the amount Astra should have withheld, not the full value of Service Steel's claim. We address these issues first.

## A.     Governing Law

Two types of mechanic's liens exist: constitutional and statutory. *Crawford Servs., Inc. v. Skillman Int'l Firm, L.L.C.*, 444 S.W.3d 265, 267 (Tex. App.—Dallas 2014, pet. dism'd); *see Trimcos, LLC v. Compass Bank*, 649 S.W.3d 907, 915–16 (Tex. App.—Houston [1st Dist.] 2022, pet. denied) (op. on reh'g). The Texas Constitution grants a lien to contractors and suppliers who directly contract with a real property owner to provide labor or materials for improvements to the property. *Crawford Servs.*, 444 S.W.3d at 267; TEX. CONST. art. XVI, § 37. The constitution also requires the Texas Legislature to "provide by law for the speedy and efficient enforcement of said liens." TEX. CONST. art. XVI, § 37; *see* TEX. PROP. CODE §§ 53.001–.287. The statutory scheme created by the Legislature—Property Code Chapter 53—also grants statutory liens to contractors and suppliers who do not directly contract with a property owner. *Crawford Servs.*, 444 S.W.3d at 268.

Because Service Steel did not directly contract with Astra, the lien at issue in this case is a statutory mechanic's lien. Subcontractors' lien rights "are totally dependent on compliance with the statutes authorizing the lien." *First Nat'l Bank in Graham v. Sledge*, 653 S.W.2d 283, 285 (Tex. 1983); *see Addison Urb. Dev. Partners, LLC v. Alan Ritchey Materials Co.*, 437 S.W.3d 597, 602 (Tex. App.—Dallas 2014, no pet.). That said, substantial compliance with the statutes "is sufficient to perfect a lien." *Sledge*, 653 S.W.2d at 285; *Patriot Contracting, LLC v. Shelter Prods., Inc.*, 650 S.W.3d 627, 653 (Tex. App.—Houston [1st Dist.] 2021, pet. denied) ("Substantial compliance means compliance with the essential requirements of a statute and occurs when a party's deviation from strict compliance does not seriously impede the legislative purpose of the statute."). We must "liberally construe" the statutes "for the purpose of protecting laborers and materialmen." *Sledge*, 653 S.W.2d at 288.

The Property Code grants a mechanic's lien if the person, under a contract with the owner's subcontractor, "furnishes labor or materials for construction or repair of" a building or improvement. TEX. PROP. CODE § 53.021(a)(1)(A), (a)(2); *Addison Urb. Dev. Partners*, 437 S.W.3d at 603 (noting "well-established authority" that Chapter 53 requires materialman to prove it "furnished goods . . . for a specific

14

job") (quotation omitted).[9] The lien secures payment for the material furnished for the construction. TEX. PROP. CODE § 53.023(1). Section 53.021 does not require that the material furnished "should actually enter into the construction of the improvement." *Addison Urb. Dev. Partners*, 437 S.W.3d at 604 (quotation omitted).

A party claiming a lien must meet certain requirements to perfect the lien. A "derivative claimant" such as a subcontractor must provide written notice of the debt to the original contractor and the owner before it may claim a lien:

> If the lien claim arises from a debt incurred by a subcontractor, the claimant must give to the original contractor written notice of the unpaid balance. The claimant must give the notice not later than the 15th day of the second month [a "second month" notice] following each month in which all or part of the claimant's labor was performed or material delivered. The claimant must give the same notice to the owner or reputed owner and the original contractor not later than the 15th day of the third month [a "third month" notice] following each month in which all or part of the claimant's labor was performed or material or specially fabricated material was delivered.

TEX. PROP. CODE § 53.056(b); *Morrell Masonry Supply, Inc. v. Loeb*, 349 S.W.3d 664, 667 (Tex. App.—Houston [14th Dist.] 2011, no pet.) ("Because a derivative

---

[9]  In the 2021 legislative session, the Texas Legislature amended numerous provisions of Property Code Chapter 53, but it also provided that the amendments "apply only to an original contract entered into on or after the effective date of this Act"— January 1, 2022—while an original contract entered into before the effective date is "governed by the law as it existed immediately before the effective date of this Act, and that law is continued in effect for that purpose." Act of May 28, 2021, 87th Leg., R.S., ch. 690, §§ 37–38, 2021 Tex. Gen. Laws 1423, 1436. Because the project began in 2016, the 2021 amendments to Chapter 53 do not apply to this dispute. For ease of reading, all citations in this opinion to Property Code Chapter 53 are to the versions of the statutes that were in effect at the time of the underlying events of this case.

claimant has no contractual relationship with the property owner, the claimant is required to give the property owner timely notice of an unpaid balance before attempting to file a lien against the property."). If the lien claim arises from a debt incurred by the original contractor, the lien claimant must give notice to the owner or reputed owner—with a copy to the original contractor—in accordance with section 53.056(b). TEX. PROP. CODE § 53.056(c).

Notice is sufficient under section 53.056 if the claimant provides "[a] copy of the statement or billing in the usual and customary form." *Id.* § 53.056(f). Although we must liberally construe the mechanic's liens statutes, that does not excuse the claimant's failure to comply with the requirement that it provide timely written notice. *Moore v. Brenham Ready Mix, Inc.*, 463 S.W.3d 109, 115 (Tex. App.—Houston [1st Dist.] 2015, no pet.); *Wesco Distrib., Inc. v. Westport Grp., Inc.*, 150 S.W.3d 553, 556 (Tex. App.—Austin 2004, no pet.) (stating that section 53.056 "requires timely notice as a prerequisite for a valid lien claim").

After giving the required written notices, a lien claimant must file an affidavit with the county clerk of the county where the property is located "not later than the 15th day of the fourth calendar month after the day on which the indebtedness accrues." TEX. PROP. CODE § 53.052(a). The lien affidavit must "contain substantially":

(1)     a sworn statement of the amount of the claim;

16

(2)    the name and last known address of the owner or reputed owner;

(3)    a general statement of the kind of work done and materials furnished by the claimant and, for a claimant other than an original contractor, a statement of each month in which the work was done and materials furnished for which payment is requested;

(4)    the name and last known address of the person by whom the claimant was employed or to whom the claimant furnished the materials or labor;

(5)    the name and last known address of the original contractor;

(6)    a description, legally sufficient for identification, of the property sought to be charged with the lien;

(7)    the claimant's name, mailing address, and, if different, physical address; and

(8)    for a claimant other than an original contractor, a statement identifying the date each notice of the claim was sent to the owner and the method by which the notice was sent.

*Id.* § 53.054(a); *Addison Urb. Dev. Partners*, 437 S.W.3d at 607 (noting that purpose of serving lien affidavit on property owner is to give notice). A lien claimant must send a copy of the affidavit to the owner or reputed owner and to the original contractor not later than the fifth day after the claimant files the affidavit. TEX. PROP. CODE § 53.055(a)–(b).

Chapter 53 addresses two related but distinct concepts that provide a source of funds for a subcontractor that has not been paid: retainage and fund-trapping. *Stolz v. Honeycutt*, 42 S.W.3d 305, 310 (Tex. App.—Houston [14th Dist.] 2001, no pet.) (stating that retainage and fund-trapping are "[t]he two main statutory schemes

providing [payment] rights to spurned subcontractors"); *Hadnot v. Wenco Distribs.*, 961 S.W.2d 232, 234 (Tex. App.—Houston [1st Dist.] 1997, no writ) (referring to retainage and fund-trapping as "two sources of funds to which a derivative claimant may look for recovery from an owner").

An owner must reserve—or retain—funds while construction is in progress:

(a)     During the progress of work under an original contract for which a mechanic's lien may be claimed and for 30 days after the work is completed, the owner shall retain:

(1)     10 percent of the contract price of the work to the owner; or

(2)     10 percent of the value of the work, measured by the proportion that the work done bears to the work to be done, using the contract price or, if there is no contract price, using the reasonable value of the completed work.

TEX. PROP. CODE § 53.101(a); *see also id.* § 53.001(1), (6) (defining "contract price" as "the cost to the owner for any part of construction or repair performed under an original contract" and "original contract" as "an agreement to which an owner is a party either directly or by implication of law"); *Page v. Structural Wood Components, Inc.*, 102 S.W.3d 720, 722 (Tex. 2003); *Pham v. Harris Cnty. Rentals, L.L.C.*, 455 S.W.3d 702, 707 (Tex. App.—Houston [1st Dist.] 2014, no pet.) ("'Retained' funds are funds withheld from the original contractor either under a contractual agreement or under section 53.101, which requires a property owner to retain ten percent of the contract price for thirty days after the project is completed.").

18

The retained funds secure the payment of persons who furnish materials. TEX. PROP. CODE § 53.102; *Page*, 102 S.W.3d at 722. A claimant has a lien on the retained funds if the claimant (1) sends the required notices under Chapter 53 and (2) files a lien affidavit within thirty days of the date the work is completed, the original contract is terminated, or the original contractor abandons performance, whichever is earlier. TEX. PROP. CODE § 53.103; *Page*, 102 S.W.3d at 721.

If the owner fails or refuses to comply, a claimant that satisfies the relevant Property Code requirements has a lien "at least to the extent of the amount that should have been retained from the original contract under which they are claiming, against the house, building, structure, fixture, or improvement and all of its properties and against the lot or lots of land necessarily connected." TEX. PROP. CODE § 53.105(a); *Loeb*, 349 S.W.3d at 671.

The fund-trapping provisions allow subcontractors to "trap, in the owner's hands, funds payable to the general contractor if the owner receives notice from the subcontractors that they are not being paid." *Page v. Marton Roofing, Inc.*, 102 S.W.3d 733, 734 (Tex. 2003) (quoting *Sledge*, 653 S.W.2d at 286); *Pham*, 455 S.W.3d at 707 ("'Trapped' funds are funds not yet paid to the original contractor at the time the property owner receives notice that a subcontractor has not been paid . . . ."); *Priv. Mini Storage Realty, L.P. v. Larry F. Smith, Inc.*, 304 S.W.3d 854, 856 (Tex. App.—Dallas 2010, no pet.) (stating that fund-trapping statutes permit

19

owner "to retain additional amounts due to the contractor upon the request of a subcontractor when the contractor fails to pay the subcontractor as required during the performance of the contract").

To utilize this mechanism, the lien claimant must include certain information in its pre-lien notice of claim: the notice to the owner must state that if the claim remains unpaid, the owner may be personally liable and its property subject to a lien unless (1) the owner withholds payments from the original contractor for payment of the claim; or (2) the claim is otherwise paid or settled. TEX. PROP. CODE § 53.056(d). If the property owner receives a notice under section 53.056, "the owner may withhold from payments to the original contractor an amount necessary to pay the claim for which he receives notice." *Id.* § 53.081(a); *Jewelry Mfrs. Exch., Inc. v. Tafoya*, 374 S.W.3d 639, 642–43 (Tex. App.—Dallas 2012, pet. denied). The owner shall retain the withheld funds until (1) the time for filing the lien affidavit has passed, or (2) if the claimant has filed a lien affidavit, until the lien claim has been satisfied or released. TEX. PROP. CODE § 53.082.

The claimant may make a written demand for payment from an owner authorized to withhold funds, and it must send a copy of the demand to the original contractor. *Id.* § 53.083(a)–(b); *Jewelry Mfrs. Exch.*, 374 S.W.3d at 643. With one exception, the property owner is "not liable for any amount paid to the original contractor before the owner is authorized to withhold funds." TEX. PROP. CODE

20

§ 53.084(a); *Loeb*, 349 S.W.3d at 669 (stating that owner must receive notice of claim before he is authorized to withhold funds from original contractor).

If the owner has received the required notices, the lien has been secured, and the claim has been reduced to final judgment, "the owner is liable and the owner's property is subject to a claim for any money paid to the original contractor after the owner was authorized to withhold funds." TEX. PROP. CODE § 53.084(b); *Marton Roofing*, 102 S.W.3d at 734–35; *Loeb*, 349 S.W.3d at 668 ("If the owner pays any money to the general contractor after receiving notice from the claimants, the owner's property will be subject to a lien to the extent of the money paid."). The amount trapped may exceed the ten percent required to be retained under the retainage statute. *Sledge*, 653 S.W.2d at 286; *Stolz,* 42 S.W.3d at 311 ("The amount trapped under the Trapping Statute (as big as the claim is big) may be more than the required retainage under the Retainage Statute (a flat ten percent of contract price or value).").

**B.    Analysis**

**1.    Identification of person to whom Service Steel furnished materials**

Astra argues that Service Steel's lien affidavit does not comply with section 53.054(a)(4) because the affidavit identifies "Ipsum Building Supplies" as the person that ordered materials from Service Steel, but OFT contracted with Rush. Evidence admitted at trial reflected that "Ipsum Building Supplies" was a registered

21

assumed name of Ruben Mercado, a man who had once been associated with Robert Gonzalez, but it was not a registered assumed name of Gonzalez or of Rush. Astra contends that the lien affidavit is legally insufficient to create a statutory lien on the property because it does not identify Rush as Service Steel's customer.

Section 53.054(a) requires a lien affidavit to "contain substantially" eight specific requirements, including "the name and last known address of the person by whom the claimant was employed or to whom the claimant furnished the materials or labor." TEX. PROP. CODE § 53.054(a)(4). In *LTF Real Estate Co. v. D&D Utility Supply, LLC*, this Court addressed whether a lien affidavit that contained no mention of the name and last known address of the person to whom the claimant furnished the materials or labor—along with two other complete omissions—substantially complied with section 53.054. *See* No. 01-11-00244-CV, 2013 WL 1183300, at *9–10 (Tex. App.—Houston [1st Dist.] Mar. 21, 2013, no pet.) (mem. op.). We concluded that it did not.

"[M]ere technical defects" in a lien affidavit can be excused, but other defects "are more substantive in nature," and overlooking these defects would "read a provision out of the statute or prejudice another party." *Id.* at *9 (quoting *Mustang Tractor & Equip. Co. v. Hartford Accident & Indem. Co.*, 263 S.W.3d 437, 441 (Tex. App.—Austin 2008, pet. denied)). We acknowledged that we must liberally construe the mechanic's lien statutes to protect laborers and materialmen, but we found it

22

"significant" that the affidavit contained "absolutely no reference" to the contractor to whom the subcontractor asserted that "it furnished the materials for which it was seeking payment." *Id.* at \*10. Although some courts had found substantial compliance even when a statutory requirement—such as the date of the pre-lien notice and the method of service—was completely omitted, "no court has ever excused the omission of the name of the party to whom materials were furnished." *Id.* This element "is the basis for securing the lien in the first place," and therefore its omission could not be considered a "mere technical defect." *Id.*

We were not persuaded by the subcontractor's argument that no prejudice resulted from the omission "because it had disclosed the information in its pre-lien notices." *Id.* Accepting this argument "would be reading out a provision of the statute that, on its face, is of critical importance for providing, through a publicly-filed document, clear identification of the claim that is [the] basis for the filing of the lien." *Id.* If the pre-lien notices and attached invoices satisfied the statutory requirement, "then the obvious purpose for requiring a lienholder to identify both when and to whom it furnished materials for which it needed to be paid would be frustrated." *Id.* We concluded that "the identity of the party to whom the materials were allegedly furnished and for which the claimant is seeking payment constitutes a material and essential component of a lien affidavit filed pursuant to section

23

53.054(a)." *Id.* (quotation omitted). By omitting this information, the subcontractor did not substantially comply with Chapter 53. *Id.*

In its lien affidavit, Service Steel averred that "[d]uring a normal course of business dealing with Ipsum Building Supplies," it "supplied structural steel construction materials including, but not limited to beams, plate, angle, tubing, bar, merchants, and channel to Ipsum" for the project. Service Steel also stated: "The person or entity who ordered the materials from claimant is Ipsum Building Supplies," with a P.O. Box address in Houston.

Relying on this Court's decision in *LTF Real Estate*, Astra argues that the lien affidavit was insufficient to create a lien on the property because it did not correctly identify Rush as Service Steel's customer. Instead, the affidavit identified Ipsum Building Supplies, an entity connected with Ruben Mercado, a former business associate of Robert Gonzalez. Under the facts of this case, we disagree that Service Steel's lien affidavit was insufficient.

At trial, Service Steel employees testified that Rush used several different names, including "Rush Steel Fabrication," "Rush Steel," "Ipsum Builders," "Ipsum Building Supplies, "Ipsum Steel," and "Ipsum Rush Steel." Service Steel invoiced "Ipsum Building Supplies" at the request of Gonzalez.

The trial court admitted a series of emails between employees of Service Steel, Rush, and OFT in May and June 2017 that concerned both the project and a different

24

project in Harris County called The Icon. Rush was the steel subcontractor for both projects. On May 11, 2017—after OFT and Service Steel had started having problems with Rush and four days before Service Steel sent its first pre-lien notice concerning the project—an OFT employee emailed a Service Steel employee and stated: "I'd like to get status on what IPSUM/Rush Steel owes for The ICON exclusively. And if any payments have been made." Service Steel forwarded a list of eight open invoices for the Icon project.

On May 15, 2017, a Rush employee emailed OFT and Enclave concerning both projects. The employee inquired about payment for the Icon project and stated that upon receipt of payment, OFT would receive a lien release from Service Steel and would "receive a lien release from Ipsum dba Rush Steel for the amount of the check recovered." This employee then stated that Rush was "seeking payment for [the project] today, we invoiced Sugar Land back in March and still have not received payment." The employee also advised that Rush had "a substantial amount of steel equaling thousands of dollars stored in [its] warehouse that has been ready for delivery for some time, this steel has been verified by Enclave staff."

On June 7, 2017, in an email entitled "Centre at Sugar Land – IPSUM," the OFT employee emailed Service Steel and asked if it could send "Centre at Sugar Land invoices, paid and unpaid for [I]psum[.]" A Service Steel employee forwarded a list of 21 invoices for the project totaling $80,158.87, none of which had been

paid.[10] The invoice numbers, sales order numbers, invoice dates, and invoice amounts listed in this email match the invoice numbers, sales order numbers, invoice dates, and invoice amounts listed in Service Steel's pre-lien notices sent to OFT, Enclave, and Ipsum Building Supplies.

Atilla Tuna testified that OFT reached out to Service Steel in late April 2017 concerning Rush's abandonment of the project. OFT inquired about "Ipsum Building Supplies" and learned that "Ruben Mercado was the owner of it" and it had "[n]othing to do with Rush Steel and all that." Tuna also testified that OFT "received a notice from Service Steel around late May" and "that was the moment that we realized the Ipsum Building Supplies name." He testified that OFT had "five parties to deal with, right, Rush Steel, Robert Gonzalez, Service Steel, Ruben Mercado, and as well as the Ipsum Building Supplies," and OFT did not know who to pay.

"[T]he identity of the party to whom the materials were allegedly furnished and for which the claimant is seeking payment constitutes a material and essential component of a lien affidavit filed pursuant to section 53.054(a)." *Id.* (quotation omitted); TEX. PROP. CODE § 53.054(a)(4). The lien affidavit in this case identified the person to whom Service Steel furnished materials: Ipsum Building Supplies. This

---

[10] Service Steel made two additional deliveries to Rush on June 8 and June 9, after it sent the email to OFT listing all outstanding invoices. The pre-lien notice sent for the June deliveries thus listed four outstanding invoices, while this email only listed two outstanding invoices for June.

is therefore not a situation in which the lien affidavit completely omitted this statutory requirement. *See LTF Real Estate*, 2013 WL 1183300, at *10 (stating that omission of name of party to whom materials were furnished "cannot be considered a mere 'technical defect'").

The record also includes evidence that OFT was aware that Service Steel had supplied steel to Rush but had not received payment, and it was also aware that Rush sometimes used the name "Ipsum." In addition to receiving the pre-lien notices identifying "Ipsum Building Supplies" as the subcontractor and the outstanding invoices, OFT asked for and received from Service Steel a list of unpaid invoices "for [I]psum." The information in this list—invoice numbers, sales order numbers, dates of invoices, and amounts of invoices—matched the information provided in Service Steel's pre-lien notices.

Based on this record, we conclude that Astra was not prejudiced by the lien affidavit identifying "Ipsum Building Supplies" as the person to whom Service Steel furnished the materials. *See Mustang Tractor & Equip.*, 263 S.W.3d at 441 ("Courts have been more willing to excuse a mistake or omission in cases where no party is prejudiced by the defect."). We therefore conclude that Service Steel's lien affidavit substantially complied with section 53.054(a)(4). *See Sledge*, 653 S.W.2d at 288 (stating that we must liberally construe Chapter 53 "for the purpose of protecting laborers and materialmen"); *Patriot Contracting*, 650 S.W.3d at 653 ("Substantial

27

compliance means compliance with the essential requirements of a statute and occurs when a party's deviation from strict compliance does not seriously impede the legislative purpose of the statute.").

## 2. Sending of pre-lien notices to Astra

Service Steel delivered materials to Rush in March, April, May, and June 2017. For Service Steel's lien to be valid, Service Steel was required to send notice of the unpaid balance to OFT by May 15, June 15, July 15, and August 15, 2017. Astra argues that "none of the written notices sent by [Service Steel] stated the total unpaid balance owed by Rush," and Service Steel did not send any pre-lien notices to Astra.

Property Code section 53.056(b) requires a derivative claimant to give notice as follows to perfect a lien:

> If the lien claim arises from a debt incurred by a subcontractor, the claimant must give to the original contractor written notice of the unpaid balance. The claimant must give the notice not later than the 15th day of the second month following each month in which all or part of the claimant's labor was performed or material delivered. The claimant must give the same notice to the owner or reputed owner and the original contractor not later than the 15th day of the third month following each month in which all or part of the claimant's labor was performed or material or specially fabricated material was delivered.

TEX. PROP. CODE § 53.056(b); *see id.* § 53.056(c) (requiring claimant, if lien claim arises from debt incurred by original contractor, to give notice "to the owner or

28

reputed owner, with a copy to the original contractor, in accordance with Subsection (b)").

The trial court admitted four pre-lien notices that Service Steel sent to both OFT and Enclave.[11] Each notice identified Service Steel as the claimant, Enclave as the owner,[12] OFT as the contractor, and Ipsum Building Supplies as the subcontractor. The May 15, 2017 notice identified six unpaid invoices dated in March 2017 for a total claim of $11,152.73. The June 15, 2017 notice identified seven unpaid invoices dated in April 2017 for a total claim of $39,587.88. Service Steel sent two pre-lien notices on June 28, 2017. The first notice sent on this date identified six invoices dated in May 2017 for a total claim of $28,424.15. The second notice identified four invoices dated in June 2017 for a total claim of $4,154.11. The four "total claims" added together equaled $83,318.87, the amount stated in Service Steel's lien affidavit.

Each pre-lien notice stated the unpaid balance for the month for which each notice was sent.[13] *See id.* § 53.056(b) ("If the lien claim arises from a debt incurred

---

[11]    Service Steel sent identical pre-lien notices to OFT and Ipsum Building Supplies.

[12]    On the "Job Information Sheet" that Rush completed for Service Steel, Rush named Enclave as the "Project Owner."

[13]    To the extent Astra complains that each pre-lien notice only stated the unpaid balance for the specific month addressed in the notice rather than the total amount owed and unpaid by Rush—for example, that the May 15, 2017 notice only stated the unpaid balance for the March 2017 invoices, rather than also stating the total amount unpaid by Rush, which would have included amounts unpaid in April and

29

by a subcontractor, the claimant must give to the original contractor written notice of the unpaid balance."). Service Steel sent pre-lien notices to OFT as the original contractor and to Enclave as the reputed owner of the project. *See id.* ("The claimant must give the same notice to the owner *or reputed owner . . . .*") (emphasis added). Although Service Steel did not send pre-lien notices to Astra as the owner, sending the notices to Enclave as the reputed owner satisfied section 53.056(b).

### 3. Application of "sham contractor" doctrine

Astra next argues that the trial court erred by determining that Service Steel properly perfected the full amount of its lien claim. In this portion of its argument, Astra contends that the "sham contractor" doctrine applies because the same people—Atilla Tuna and his brother Omar—own and control both Astra and OFT. As a result of this doctrine, Rush should be elevated to an "original contractor," and the value of OFT and Rush's contract—an amount worth a fraction of the total amount spent to construct the project—should be used to calculate the amount that Astra was required to retain under the retainage statute. In its third issue, Astra

---

the first half of May—the statute does not require such a statement. *See* TEX. PROP. CODE § 53.056(b) ("If the lien claim arises from a debt incurred by a subcontractor, the claimant must give to the original contractor written notice of the unpaid balance. The claimant must give the notice not later than the 15th day of the second month following each month in which all or part of the claimant's labor was performed.").

argues that Service Steel's remedy under the retainage statute is limited to a lien, not actual damages.

Astra also argues that Service Steel failed to trap any funds paid to Rush under the fund-trapping provisions because the pre-lien notices were not sent to Astra and therefore it never notified Astra that Rush owed it money. Additionally, Astra argues that it only made one payment to Rush after Service Steel sent its first pre-lien notice, and therefore even if this notice was sufficient to trap funds, the amount of funds trapped are limited to $11,152.73, the amount Service Steel claimed in its first pre-lien notice.

In some instances, Chapter 53 allows a subcontractor to be considered as an original contractor. A person who furnishes materials "under a direct contractual relationship with another person is considered to be in direct contractual relationship with the owner and has a lien as an original contractor" if one of three circumstances is met:

> (1) the owner contracted with the other person for the construction or repair of a house, building, or improvements and the owner can effectively control that person through ownership of voting stock, interlocking directorships, or otherwise;
>
> (2) the owner contracted with the other person for the construction or repair of a house, building, or improvements and that other person can effectively control the owner through ownership of voting stock, interlocking directorships, or otherwise; or
>
> (3) the owner contracted with the other person for the construction or repair of a house, building, or improvements and the contract

was made without good faith intention of the parties that the other person was to perform the contract.

*Id.* § 53.026(a); *Trinity Drywall Sys., LLC v. Toka Gen. Contractors, Ltd.*, 416 S.W.3d 201, 216 (Tex. App.—El Paso 2013, pet. denied) ("[T]here is no requirement that the owner does in fact control the original contractor or that the original contractor does in fact control the owner."). This "sham contractor" provision "was designed to elevate a subcontractor or materialman to an original contractor where the original contractor acquired such status by virtue of a sham relationship with the owner." *Trinity Drywall Sys.*, 416 S.W.3d at 209. If a sham contract exists, "the legal fiction is to be ignored and the subcontractor is deemed to be an original contractor," which places the subcontractor "in direct privity with the property owner for purposes of the mechanic's and materialman's lien statutes." *Id.* at 211–12.

The Texas Legislature first enacted the sham contractor provision in 1965. Prior to this time, "it was a common practice for owners to preclude those with whom they dealt from enjoying the more advantageous position of original contractor by assuming that position themselves through a sham original contractor." *Da-Col Paint Mfg. Co. v. Am. Indem. Co.*, 517 S.W.2d 270, 273 (Tex. 1974). The sham contractor provision "discouraged the practice" by giving "the subcontractor or materialman his true status of original contractor where the owner is found to control the nominal or sham original contractor." *Id.* The distinction between an original contractor and a subcontractor "is of fundamental importance" because a

32

"subcontractor does not have a constitutional lien and faces a more onerous burden in perfecting a statutory lien." *Id.* (citation omitted); *Trinity Drywall Sys.*, 416 S.W.3d at 210 (stating that effect of sham contractor provision "is to change and improve a subcontractor or materialman's position in the construction contract chain").

Astra argues that the trial court should have determined that it and OFT had a sham contractor relationship. Atilla Tuna testified that Astra is a single-purpose entity that owns property, and it is owned by Atilla and his brother Omar. Omar owns OFT. Atilla is vice president of OFT and helps Omar manage OFT. Both Atilla and Omar have authority to sign checks to pay subcontractors. Astra and OFT—and Enclave, the property management company owned by Atilla—have offices at the same address.

Astra attempts to use the sham contractor doctrine to alter the analysis of how much it was required to retain for the purpose of the statutory retainage requirement. Astra argues that because it and OFT had a sham contractor relationship, subcontractor Rush should be elevated to an original contractor. With Rush now as an original contractor, the trial court should have looked to that contract price— rather than the contract price for the entire project—when determining statutory retainage. *See* TEX. PROP. CODE § 53.101(a) (requiring owner to retain "10 percent of the contract price of the work to the owner" or "10 percent of the value of the

33

work, measured by the proportion that the work done bears to the work to be done, using the contract price or, if there is no contract price, using the reasonable value of the completed work"); *id.* § 53.001(1) (defining "contract price" as "the cost to the owner for any part of construction or repair performed under an original contract"). The total price of Rush's subcontract was $304,000, but the subcontract expressly provided that $120,000 of this price would be paid to a different vendor. The subcontract balance available to Rush was $184,000. Ten percent of this amount is $18,400, and although that should have been the maximum amount that Astra was required to retain, because Rush provided only $37,000 worth of steel for the project, Astra was only required to retain ten percent of *that* amount, or $3,700. Astra argues that the trial court therefore erred by concluding that it was required to retain $400,000, or ten percent of the $4 million spent to construct the project.

Astra cites no law to support this application of the sham contractor doctrine—as a vehicle to reduce the burden on the owner by lowering the amount the owner must retain—and our research has not revealed any. Instead, the caselaw supports the position that the Legislature enacted the sham contractor doctrine to protect subcontractors and materialmen. When a sham contractor relationship exists between the owner and the original contractor, courts treat the subcontractor as having a "direct contractual relationship with the owner" and a "lien as an original contractor," which reduces the burden on the subcontractor in perfecting its lien. *See*

34

*Id.* § 53.026(a); *Da-Col Paint Mfg.*, 517 S.W.2d at 273; *see also Sw. Props., L.P. v. Lite-Dec of Tex., Inc.*, 989 S.W.2d 69, 72 (Tex. App.—San Antonio 1998, pet. denied) (construing "in a direct contractual relationship" language of section 53.026 "as an effort to effectuate the timetables for filing liens and not an effort to control liability of an owner"). Rejecting this use of the sham contractor doctrine is consistent with the Texas Supreme Court's long-standing and repeated admonition that we are to liberally construe Chapter 53 "for the purpose of protecting laborers and materialmen." *First Nat'l Bank in Dallas v. Whirlpool Corp.*, 517 S.W.2d 262, 269 (Tex. 1974); *Sledge*, 653 S.W.2d at 288; *Page*, 102 S.W.3d at 723 & n.3.

We conclude that the trial court did not err by using the total cost of construction—rather than the cost of OFT's subcontract with Rush—to calculate the amount that Astra was required to withhold under the retainage statute. *See* TEX. PROP. CODE § 53.101(a).

### 4. The remedy for failure to comply with the retainage statute

Astra also argues in its third issue that the trial court erred by awarding damages for Astra's failure to comply with the retainage statute because the only remedy under that statute is a lien to the extent of the amount the owner should have withheld, not personal liability for damages.

Atilla Tuna testified that Astra withheld "10 percent of all payments" from OFT, and it paid the retained amounts to OFT.[14] In its findings and conclusions, the trial court concluded that Astra "was required to withhold at least $400,000 in retainage on the Project from OFT Enterprises" and was "liable for failing to withhold retainage on the Project."

The trial court's final judgment stated:

Accordingly, it is ORDERED, ADJUDGED and DECREED that Service Steel Warehouse Co., L.P., does have and recover judgment against Astra Ventures, LLC, for the following:

1.    Damages in the amount of $83,318.87;

2.    Pre-judgment interest in the amount of $94,263 through September 17, 2023 together with interest at the per diem rate of $40.85 from September 18, 2023 through the date of judgment.

3.    Post-judgment interest at the per diem rate of $40.85 after the date of judgment until paid in full;

4.    Service Steel Warehouse Co., L.P.'s mechanic's lien recorded under Document No. 2017071912 in the Real Property Records of Fort Bend County, Texas is ordered foreclosed against the following property and improvements:

All of Reserve "B" of Telfair Lakefront District East Business Park Commercial Reserves Phase 2, a subdivision of the City of Sugar Land, Texas recorded in the Real Property Records of Fort Bend County as Plat No. 20130097 under Document No. 2013056279.

---

[14]    Tuna could not remember the total amount withheld from—and then ultimately paid to—OFT. He explained the justification for the retainage payment to OFT: "You have to pay it, that's the industry's standard. As soon as the job is completed, you cannot hold the funds any more. And most of the times, general contractors have subcontractors, then they have [vendors]. You cannot hold any money indefinitely. As soon as the job is complete, you pay them."

Foreclosure of the lien is limited to the amount of $83,318.87;

5. An order of sale and writ of possession shall issue directing that (1) the Property be sold (2) that the proceeds of the sale be applied against the damages award in the amount of $83,318.87 rendered above, and (3) that the Plaintiff may enter a credit bid at the foreclosure sale of the Property up to the amount of the judgment specified above.

6. Costs of Court.

(Emphasis omitted.)

The final judgment awarded $83,318.87 in damages to Service Steel. But the judgment also foreclosed on Service Steel's mechanic's lien, ordered the property to be sold at foreclosure, limited foreclosure to the amount of the damages award, and ordered that the sale proceeds be applied against the damages award. We conclude that the trial court did not impermissibly award damages to Service Steel.

**5. Astra's arguments relating to fund-trapping**

In the last portions of its second and third issues, Astra advances several arguments to support its contention that Service Steel did not successfully trap any funds paid to Rush under the fund-trapping statute. It first argues that Service Steel did not send its first pre-lien notice—dated May 15—to Astra, and therefore Astra did not have any knowledge that Rush owed Service Steel money and could not be liable under the fund-trapping statute. It next argues that although Astra received copies of Service Steel's unpaid invoices on June 7, 2017, Astra did not make any payments to Rush after that date, so no funds were trapped for Service Steel's

37

benefits. Astra further argues that Service Steel did not comply with the notice provisions for the fund-trapping statute because Service Steel identified Ipsum Building Supplies as its customer and not Rush. Finally, Astra argues that if Service Steel's May 15 pre-lien notice was sufficient, OFT only made one payment to Rush after that date, and therefore the most Astra could be liable for under the trapping statute was $11,152.73, the amount of the claim in the first pre-lien notice.

In its live pleading, Service Steel made a "claim against the lien and if not paid, requests that this Court order payment of its claim for retainage, funds trapping and lien obligations by Owners and the General Contractor, OFT." In the final judgment, the trial court awarded Service Steel $83,318.87 in damages and ordered foreclosure of Service Steel's lien "limited to the amount of $83,318.87." The trial court made no findings or conclusions relating to fund-trapping. Instead, the court concluded that Astra should have retained at least $400,000 from OFT in statutory retainage, and Astra was liable for failing to withhold retainage.

We have concluded that the trial court did not err by using the total amount that Astra paid OFT to complete the project ($4,000,000) to calculate the amount Astra should have retained under section 53.101 ($400,000). This amount that Astra was statutorily required to retain was greater than the amount of Service Steel's lien claim. This is, therefore, not a situation in which Service Steel needed to look to fund-trapping over and above retainage to recover the full value of its claim. *See*

*Stolz*, 42 S.W.3d at 311 ("The amount trapped under the Trapping Statute (as big as the claim is big) may be more than the required retainage under the Retainage Statute (a flat ten percent of contract price or value)."). Because the amount Astra was required to retain under the retainage statute fully covered the amount of Service Steel's claim and because the trial court made no findings or conclusions specifically related to fund-trapping, we conclude that we need not address Astra's appellate arguments concerning fund-trapping. *See Hadnot*, 961 S.W.2d at 234 (referring to retainage and fund-trapping as "two sources of funds to which a derivative claimant may look for recovery from an owner").

We overrule Astra's second and third issues.

### 6. Effect of our holding concerning the validity of Service Steel's lien on Astra's first issue regarding denial of conditions precedent

Service Steel pleaded that it had complied with all conditions precedent to suit:

> All conditions precedent to Service Steel's perfection of its mechanic['s] lien by proper service of notices, timely filing of the mechanic's lien and including the correct information in the lien affidavit and notices have been either performed or have occurred.

In its answer, Astra (along with OFT and Enclave) responded as follows:

> Defendants deny the allegations set out in paragraph 9 of Plaintiff's Original Petition [allegations that Service Steel filed a lien after it was not paid, notice of the lien affidavit was served, and all conditions precedent had been performed] all and several. Defendants specifically deny that all conditions precedent to Plaintiff Service Steel's perfection of mechanics lien have been performed or occurred.

39

Despite hearing evidence at trial relating to whether Service Steel complied with the statutory requirements for pre-lien notices and lien affidavits, the trial court concluded in its findings and conclusions that "Defendants' Answer failed to specifically identify the conditions precedent which had not occurred. Pursuant to Texas Rule of Civil Procedure 54, Service Steel's lien notice letters and Mechanic's Lien Affidavit are deemed to comply with the requirements for perfection of a mechanic's lien in Texas Property Code Chapter 53."

In its first issue, Astra contends that the trial court erroneously concluded that Astra had waived its right to assert at trial that Service Steel had failed to send the statutorily required pre-lien notices and that Service Steel's lien was defective. Astra argues that allegations in its answer and other pleadings—including its motion for summary judgment and its amended responses to Service Steel's request for disclosure—complied with Rule of Civil Procedure 54 concerning the denial of conditions precedent. Astra's second and third issues, discussed above, concern the validity of Service Steel's lien.

We have reviewed the trial evidence relevant to Astra's second and third issues, addressed the merits of these two issues, and concluded that the trial court correctly ruled that this lien was valid. In light of these holdings, we conclude that even if Astra is correct that the trial court erred by concluding that Astra did not specifically deny conditions precedent relating to perfection and validity of the lien

40

and therefore waived any challenge on those grounds, this conclusion did not lead to an improper judgment and does not constitute reversible error. *See BMC Software Belg.*, 83 S.W.3d at 794 (stating that if trial court's conclusion of law is erroneous but court rendered proper judgment, erroneous conclusion does not require reversal); TEX. R. APP. P. 44.1(a)(1) (providing that appellate court may not reverse judgment on ground that trial court made error of law unless appellate court concludes that complained-of error "probably caused the rendition of an improper judgment").

We therefore need not address the merits of Astra's first issue.

## Award of Prejudgment and Post-judgment Interest

In its fourth issue, Astra contends that the trial court erred by awarding pre- and post-judgment interest to Service Steel.

## A. Prejudgment Interest

Prejudgment interest is compensation that the law allows as "additional damages for lost use of the money due as damages during the lapse of time between the accrual of the claim and the date of judgment." *Ventling v. Johnson*, 466 S.W.3d 143, 153 (Tex. 2015) (quoting *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 528 (Tex. 1998)). Two legal sources exist for an award of prejudgment interest: (1) general principles of equity and (2) an enabling statute. *Johnson & Higgins of Tex.*, 962 S.W.2d at 528. When no statute controls, equitable principles govern an award of prejudgment interest, and the decision to award such

41

interest falls within the trial court's discretion. *Patriot Contracting*, 650 S.W.3d at 659. We therefore review awards of prejudgment interest for an abuse of discretion. *Id.*; *Fortitude Energy, LLC v. Sooner Pipe LLC*, 564 S.W.3d 167, 188 (Tex. App.—Houston [1st Dist.] 2018, no pet.).

Chapter 53 does not include a provision allowing a lien claimant to recover prejudgment interest upon foreclosure of a mechanic's lien.[15] We therefore look to equitable principles in reviewing the trial court's award of prejudgment interest here. *See Patriot Contracting*, 650 S.W.3d at 659.

Astra cites an unpublished 1992 opinion from the Dallas Court of Appeals in support of its argument that the trial court should not have awarded prejudgment interest to Service Steel. In *Cornerstone Bank, N.A. v. J.N. Kent Construction Co.*, the Dallas Court stated that although the purpose of prejudgment interest is to compensate the plaintiff rather than punish the defendant, it knew "of no law that renders a party liable for prejudgment interest when that party is not liable for actual

---

[15] As Astra argues, Texas courts have held that Chapter 53 does not allow prejudgment interest to be included in the amount of the lien. *See, e.g.*, *Ambassador Dev. Corp. v. Valdez*, 791 S.W.2d 612, 623–24 (Tex. App.—Fort Worth 1990, no writ); TEX. PROP. CODE § 53.024 (limiting amount of lien claimed by subcontractor to "an amount equal to the proportion of the total subcontract price that the sum of the labor performed, materials furnished, materials specially fabricated, reasonable overhead costs incurred, and proportionate profit margin bears to the total subcontract price" minus "the sum of previous payments received by the claimant on the subcontract"). Here, the trial court limited foreclosure of Service Steel's mechanic's lien to $83,318.87, which represented the total amount of steel Service Steel furnished for the project. The court awarded pre-judgment interest separately, not as part of the lien.

damages." *See* No. 05-91-00499-CV, 1992 WL 86591, at \*14 (Tex. App.—Dallas Apr. 17, 1992, no writ) (not designated for publication). The property owners were not personally liable for the lien claimant's damages; instead, "only the property subject to the mechanic's lien is liable." *Id.* The court concluded that, as a result, the owners were not personally liable for prejudgment interest. *Id.*

We decline to follow *Cornerstone Bank*. Courts have permitted a mechanic's lien claimant to recover prejudgment interest on a claim for foreclosure of the lien. *See Hayek v. W. Steel Co.*, 478 S.W.2d 786, 795–96 (Tex. 1972), *superseded by statute on other grounds as recognized in Page*, 102 S.W.3d at 724.[16] No provision in Chapter 53 expressly allows for an award of prejudgment interest when foreclosing a mechanic's lien, but in that situation courts look to general principles of equity and the common law when deciding whether to exercise their discretion and award prejudgment interest. *See Johnson & Higgins of Tex.*, 962 S.W.2d at 528; *Patriot Contracting*, 650 S.W.3d at 659. We conclude that the trial court did not abuse its discretion in awarding prejudgment interest to Service Steel.

---

[16] In its reply brief, Astra contends that *Hayek* has been overruled, and it cites the Texas Supreme Court's opinion in *Page v. Structural Wood Components* as support. The primary issue in *Hayek* concerned the statutory retainage obligation. *See Hayek v. W. Steel Co.*, 478 S.W.2d 786, 787–95 (Tex. 1972). *Page* recognized that the Texas Legislature amended the retainage statute in response to *Hayek* in the next legislative session following that decision. *See Page v. Structural Wood Components, Inc.*, 102 S.W.3d 720, 724 (Tex. 2003). The portion of *Hayek* addressing retainage has therefore been superseded by statute, but the amendments did not address prejudgment interest—also at issue in *Hayek*—and neither did *Page*.

We therefore turn to whether the trial court applied the correct interest rate in awarding prejudgment interest. The trial court applied an interest rate of 18%, concluding that this rate was appropriate because the contract between Service Steel and Rush specified that interest accrues on unpaid invoices at an 18% rate. Astra contends that if prejudgment interest must accrue, the interest rate should be lower than the 18% rate contained in the contract between Service Steel and Rush—a contract to which it was not a party—and awarded in the judgment. Specifically, Astra urges use of the judgment rate at the time of trial, which was 8.5%.

In defense of the 18% rate, Service Steel relies on *Patriot Contracting*. There, this Court upheld an 18% rate on a payment bond for two reasons. First, the bond followed Property Code section 53.172(6) in requiring the bond obligors to make an express promise to pay "the amount" that the named obligees would be entitled to recover in the event of valid claims. *Patriot Contracting*, 650 S.W.3d at 659 (quoting TEX. PROP. CODE § 53.172(6)). Second, to calculate that amount, one necessarily had to look to the underlying contract, and that contract in turn called for 18%. *Id.* at 659–60. Using any other rate would have disregarded "the obligations assumed in executing the payment bond." *Id.* at 659.

In reply, Astra acknowledges *Patriot Contracting* but distinguishes it as having "involved a claim on a payment bond in which owner and surety contractually agreed to pay for these amounts." We agree. The bond obligors in

44

*Patriot Contracting* expressly promised to pay an underlying amount, as required by Property Code Chapter 53. Here, however, the promise runs between Service Steel and Rush, not between Service Steel and Astra. *Patriot Contracting* does not reach this scenario. This case lacks the promise that exists in a bond case. Hence, we are unwilling to impose an 18% rate on Astra.

The trial court acted within its discretion in awarding Service Steel prejudgment interest, but the 18% rate specified in the contract between Service Steel and Rush was not appropriate. We therefore conclude that the appropriate pre-judgment interest rate is 8.5%, which was the post-judgment interest rate at the time the trial court signed the final judgment.[17] *See Johnson & Higgins of Tex.*, 962 S.W.2d at 532 ("We further hold that prejudgment interest accrues at the rate for postjudgment interest and it shall be computed as simple interest.").

## B. Post-judgment Interest

A money judgment must specify the post-judgment interest rate applicable to that judgment. TEX. FIN. CODE § 304.001; *see id.* § 301.002(a)(12) (defining "money judgment" as "a judgment for money" and stating that "the term includes legal

---

[17] Texas Finance Code section 304.003 requires the Texas Consumer Credit Commissioner to determine the post-judgment interest rate "to be applied to a money judgment rendered during the succeeding calendar month." TEX. FIN. CODE § 304.003(b). In April 2024, the post-judgment interest rate was 8.5%. *See* TEX. OFF. OF CONSUMER CREDIT COMM'R, OCCC Historical Table of Postjudgment Interest Rates (revised Aug. 21, 2025), *available at* https://occc.texas.gov/sites/default/files/2025-08/postjudgementinterestrate_history.pdf.

interest or contract interest, if any, that is payable to a judgment creditor under a judgment"). A party may recover post-judgment interest even if the trial court does not specifically award it in the final judgment. *Fortitude Energy*, 564 S.W.3d at 189.

A money judgment on a contract that provides for interest earns post-judgment interest at a rate equal to the lesser of (1) the rate specified in the contract, or (2) 18 percent a year. TEX. FIN. CODE § 304.002. If, as here, Finance Code section 304.002 does not apply, a money judgment earns post-judgment interest at a rate tied to the prime rate published by the Board of Governors of the Federal Reserve System. *Id.* § 304.003(a), (c) (providing that applicable post-judgment interest rate is either prime rate, five percent a year if prime rate is less than five percent, or fifteen percent a year if prime rate is more than fifteen percent). Each month the Texas Consumer Credit Commissioner "shall determine the postjudgment interest rate to be applied to a money judgment rendered during the succeeding calendar month." *Id.* § 304.003(b). As stated above, in April 2024, the month in which the trial court signed the final judgment, the post-judgment interest rate was 8.5%.

Astra argues that the trial court erred by awarding post-judgment interest because "there should be no monetary damages awarded against [Astra] on a claim for foreclosure of a mechanic's lien" and the final judgment is not a money judgment. Astra further argues that if post-judgment interest is permissible, the trial court should not have awarded interest at 18%—the rate specified in the contract

46

between Service Steel and Rush—but should have instead used 8.5%, the post-judgment interest rate in April 2024 specified by the Office of the Consumer Credit Commissioner and Finance Code section 304.003.

The final judgment awarded Service Steel "[d]amages in the amount of $83,318.87," ordered foreclosure of Service Steel's mechanic's lien "limited to the amount of $83,318.87," ordered the property to be sold at foreclosure, and ordered "that the proceeds of the sale be applied against the damages award in the amount of $83,318.87 rendered above." We conclude that this is a money judgment. Because this is a money judgment to which Finance Code section 304.002 does not apply, the judgment earns post-judgment interest at the rate determined by section 304.003: 8.5%. *See id.* § 304.003(a), (c)(1). We conclude that the trial court erred by awarding post-judgment interest at the rate of 18%.[18]

We sustain Astra's fourth issue.

**Offset**

Finally, in its fifth issue, Astra argues that the trial court erred by failing to order an offset. Astra contends that Service Steel did not prove that "$83,318.87

---

[18] The final judgment did not specify the post-judgment interest rate as a percentage but instead awarded post-judgment interest "at the per diem rate of $40.85 after the date of judgment until paid in full." In its findings and conclusions, the trial court found that "[t]he per diem rate for interest which accrued after September 17, 2023 is $40.85" and concluded that "Service Steel is awarded post-judgment interest on the amount of $83,[3]18.87 at the rate of 18.00% per annum from the date of judgment until paid in full."

47

worth of materials meeting the required standards was delivered to the project construction site." Instead, Service Steel only delivered $37,000 worth of steel that met project specifications before Rush abandoned the job. Additionally, due to Rush's abandonment, OFT hired other subcontractors to complete Rush's scope of work. Astra argues that if these amounts are offset against the amount of Service Steel's claim, Astra would not owe Service Steel anything.

First, with respect to Astra's argument that Service Steel did not prove it delivered $83,318.87 worth of steel to the construction site, we agree with Service Steel that it proved through invoices and sales orders that it delivered that amount of steel to Rush. The mechanic's lien statute does not require that the material actually enter into construction; instead, it requires only that the materialman "furnishes . . . materials for construction."[19] TEX. PROP. CODE § 53.021(a)(1); *Lexcon, Inc. v. Gray*, 740 S.W.2d 83, 85 (Tex. App.—Dallas 1987, no writ) ("[I]t is sufficient if the materialman proves delivery of the goods to the construction site *or that he furnished the goods to the builder for a specific job*.") (emphasis added). Service Steel's documentary evidence showing that it delivered $83,318.87 worth

---

[19] The Texas Supreme Court has followed this interpretation of the mechanic's lien statute since at least 1887, acknowledging that "[t]o furnish materials for the construction of a house and to furnish materials which enter into its construction are very different things." *Trammell v. Mount*, 4 S.W. 377, 378 (Tex. 1887). Construing the lien statute to require the latter "strain[s] its words beyond their usual meaning, and this should not be done for the purpose of depriving mechanics and others of the protection which the statute was evidently designed to give them." *Id.*

of steel to Rush is sufficient to establish that Service Steel "furnish[ed] . . . materials for construction."

Second, with respect to Astra's argument regarding offset, we agree with Service Steel that Astra has not shown that it is entitled to an offset. "Generally, once a construction project has been substantially completed, a party is entitled to damages for errors or defects in construction." *Schear Hampton Drywall, LLC v. Founders Com., Ltd.*, 586 S.W.3d 80, 91 (Tex. App.—Houston [14th Dist.] 2019, no pet.) (citing *Ashford Partners, Ltd. v. ECO Res., Inc.*, 401 S.W.3d 35, 39 (Tex. 2012)). Substantial completion is the "legal equivalent of full compliance less any offsets for remediable defects." *Ashford Partners*, 401 S.W.3d at 39 (quotation omitted). If a project is substantially complete, the measure of damages for errors or defects in construction is the cost of completing the job or of remedying remediable defects without impairing the building as a whole. *Id.* (quotation omitted); *Schear Hampton Drywall*, 586 S.W.3d at 91.

Astra relies on *Schear Hampton Drywall* to support its argument that it is entitled to an offset against Service Steel's lien claim. In that case, the original contractor hired Schear Hampton as the stucco subcontractor after the first stucco subcontractor abandoned the job. *See Schear Hampton Drywall*, 586 S.W.3d at 84. Schear Hampton served a pre-lien notice alleging that an unpaid balance of over $152,000 existed on its subcontract. *Id.* It later filed a mechanic's lien and sought

foreclosure. *Id.* The property owner counterclaimed and argued that the lien should be offset by "'damages caused by Schear [Hampton's] breach of its subcontract with [the general contractor],' 'the cost to correct errors and omissions by Schear [Hampton] in the performance of its subcontract,' and 'the amount necessary to complete the work Schear [Hampton] agreed to perform in its subcontract.'" *Id.* The trial court found that Schear Hampton's lien was partially valid and that the owner was entitled to a $15,000 offset in damages on its counterclaim. *Id.* at 85.

On appeal, Schear Hampton argued that the offset was not supported by legally and factually sufficient evidence. As part of this contention, Schear Hampton argued that the owner could not sue it for breach of contract because the owner was not a third-party beneficiary of the subcontract between Schear Hampton and the general contractor. *Id.* at 89. After considering the language of the subcontract, the Fourteenth Court of Appeals concluded that Schear Hampton and the general contractor "intended to provide a direct benefit" to the owner, and therefore the owner was a third-party beneficiary of the subcontract. *Id.* at 90–91.

Turning to the offset claim, the Fourteenth Court stated:

As discussed, Founders [the owner] established that it was a third-party beneficiary of the subcontract. It brought counterclaims against Schear Hampton based on faulty workmanship and sought a lien offset by the cost to remedy those defects. Schear Hampton has cited no authority for the proposition that a third-party beneficiary is barred from seeking an offset for remediable defects under the substantial completion doctrine when a subcontractor files a materialman's lien claim under the Property Code. And we have found no such authority.

*Id.* at 91. The court then examined Chapter 53 and determined that the Legislature "did not expressly preclude offsets to the amount of the lien for defects in construction under the common law substantial completion doctrine." *Id.* at 92. It concluded that the owner "was entitled to an offset of the amount of Schear Hampton's lien by the number of remediable defects found by the trial court if such findings are supported by legally and factually sufficient evidence." *Id.* After examining the evidence, which was conflicting, the court ultimately concluded that Schear Hampton did not establish that no evidence supported the trial court's finding that it caused at least $15,000 worth of damages to the owner or that this finding was contrary to the overwhelming weight of the evidence. *Id.* at 93.

We conclude that *Schear Hampton Drywall* is distinguishable from the present case. In *Schear Hampton Drywall*, the property owner asserted affirmative claims for negligence and breach of contract against the stucco subcontractor arising out of alleged deficiencies in the subcontractor's work, and there was evidence supporting those allegations presented at trial. Here, Astra did not assert any claims for affirmative relief against Service Steel. Astra did not, for example, allege that Service Steel breached any contractual obligations by providing defective steel to the project. Moreover, although Astra presented evidence that it had to hire other subcontractors to finish the steel work on the project, Astra had to take those steps

not due to any problems with Service Steel's work but because Rush—Astra's steel subcontractor—abandoned the job.

Astra cites no other authority that supports its entitlement to an offset under the circumstances present in this case. In the absence of authority holding that a property owner may offset the amount it spends to complete construction against a lien claim asserted by a supplier to a subcontractor when the property owner asserts no affirmative claims for relief against the supplier, we conclude that the trial court did not err by refusing to offset the amounts Astra paid to other subcontractors to finish the steel work against the amount of Service Steel's claim.

We overrule Astra's fifth issue.

## Conclusion

We reverse the portions of the trial court's judgment awarding prejudgment and post-judgment interest to Service Steel and remand to the trial court for the limited purpose of recalculating the awards of prejudgment and post-judgment interest at the proper rate of 8.5%. We affirm the remainder of the trial court's judgment.

David Gunn
Justice

Panel consists of Justices Guerra, Gunn, and Dokupil.